**SUPER SULKY, INC., Plaintiff–Appellant,**

v.

**UNITED STATES TROTTING ASSOCIATION, Defendant–Appellee.**

**No. 97–4291.**

United States Court of Appeals, Sixth Circuit.

Argued Jan. 28, 1999.

Decided April 6, 1999.

Kathleen J. St. John (argued and briefed), William S. Jacobson (briefed), John A. Huettner (briefed), Nurenberg, Plevin, Heller & McCarthy Company, LPA, Cleveland, OH, for Appellant.

John J. Chester (argued and briefed), Richard A. Frye (briefed), Karen S. Hockstad (briefed), Chester, Willcox & Saxbe, Columbus, OH, James E. Meeks (briefed), Ohio State University College of Law, Columbus, OH, for Appellee.

Before: MARTIN, Chief Judge; RYAN and GILMAN, Circuit Judges.

GILMAN, Circuit Judge.

The United States Trotting Association ("USTA") is a non-profit Ohio corporation that establishes rules for harness racing, registers horses, and licenses owners and drivers. In 1993, the USTA adopted rules to standardize the design of the "sulky," a lightweight two-wheeled buggy that the horse pulls in harness racing. By doing so, it induced various state racing commissions to ban a novel form of sulky known as the Cheetah, created by the Super Sulky Corporation. This drove Super Sulky out of business. In response, Super Sulky brought suit against the USTA and numerous other defendants under §§ 1 and 2 of the Sherman Act, Ohio antitrust law, and Ohio law prohibiting tortious interference with business relationships and with contractual rights.

The claims against all defendants other than the USTA were dismissed for want of personal jurisdiction. After partial summary judgment was granted in favor of the USTA on the Sherman Act § 2 monopolization claim, the case proceeded to trial on the remaining counts. The jury awarded Super Sulky $650,000 in damages, which was trebled under the Sherman Act to $1,950,000. Shortly thereafter, the USTA moved for judgment as a matter of law, or alternatively, for a new trial. The district court granted both parts of the USTA's motion. Super Sulky now appeals. It also requests that three questions of Ohio law be resolved by certification of the issues to the Ohio Supreme Court.

For the reasons set forth below, the district court's grant of judgment to the USTA as a matter of law is **AFFIRMED**, and Super Sulky's motion to certify questions to the Ohio Supreme Court is **DENIED**.

## I. BACKGROUND

Super Sulky was founded in 1992 for the purpose of manufacturing the "Cheetah Super Sulky." The Cheetah represented a break from traditional sulky design in that the shafts connecting the buggy to the horse had an hourglass shape instead of the traditional straight shafts. Super Sulky claimed that this created a narrower and more aerodynamic form, leading to faster times on the track. The perceived speed advantage resulted in large sales for Super Sulky and spawned a number of imitations known as "cheetah-style bikes."

The Cheetah, however, was not universally popular. Some drivers felt that the Cheetah reduced visibility and was less stable. Others in the harness-racing community disliked Cheetahs because they felt that the multiplicity of sulkies, of which the Cheetah was only one, was confusing to bettors at the track and led to reduced profits for everyone. Still others disliked the Cheetah because they felt that the increased speed that the Cheetah allowed led to more wear on the horses. Finally, some of the owners disliked having to spend increasing amounts on sulkies just to stay competitive.

In February of 1993, the issue of sulky standardization was first broached at a meeting of the USTA. Members of a panel discussing the issue at that meeting told the USTA's Board of Directors that cheetah-style bikes were unsafe and confusing to bettors. The panel included representatives of the Illinois Harness Horseman's Association, an organization that had recommended the banning of all cheetah-style bikes in Illinois, and representatives of Jerald, the leading maker of the traditional-style sulky. This panel informally recommended that the sulky be standardized based on the measurements of the traditional-style sulky. The Board formed a committee to study the issue.

This committee, known as the Industry Wide Sulky Committee ("IWSC"), was made up of drivers, representatives of state-level harness-racing associations, and others involved in the racing community. No representatives of the sulky manufacturers, however, were members of the IWSC. The IWSC met five times and solicited a variety of perspectives on the issue.

At one meeting, sulky manufacturers were invited to make presentations to the IWSC. Super Sulky was among the manufacturers that did so.

The IWSC also sent out a questionnaire to all active sulky drivers. This survey revealed that, among other things, the majority of active drivers felt that cheetah-style sulkies were unsafe, limited the driver's view, and had stability problems. An overwhelming majority (78%) said that sulkies should be standardized, and that the conventional-style sulky should be the standard.

In August of 1993, the IWSC recommended that the USTA adopt a series of standards applicable to sulkies, one of which would have the effect of banning cheetah-style sulkies. The other recommendations included testing all sulky styles and models, inspecting sulkies periodically, retiring sulkies after eight years, and each manufacturer carrying at least $1 million in liability insurance. Following the IWSC's announcement, Super Sulky's sales began dropping off. Shortly thereafter, it ceased manufacturing sulkies altogether.

In March of 1994, the USTA formally adopted the sulky standardization rules. These rules technically apply only to races at which there is no "pari-mutuel" betting, but the USTA's standards are highly influential. Within two years, all state racing commissions had adopted similar standardization rules.

Super Sulky filed suit in the interim between the recommendation by the IWSC and the USTA's formal adoption of the sulky standardization rules. The USTA, several other sulky manufacturers, and a number of individual members of the USTA were named as defendants. Super Sulky alleged that (1) the USTA had conspired with sulky manufacturers to restrain trade in violation of § 1 of the Sherman Act, (2) the USTA held an illegal monopoly in violation of § 2 of the Sherman Act, (3) the USTA had violated Ohio antitrust laws, and (4) the USTA had vio-lated the Ohio prohibitions against tortious interference with business relationships and with contractual rights.

All defendants except the USTA were dismissed for lack of personal jurisdiction. The USTA was then granted summary judgment as to Super Sulky's claims under § 2 of the Sherman Act, but the case proceeded to trial on the other claims. Super Sulky's complaint did not explicitly allege that the USTA's conduct, in and of itself, was "concerted action" violative of § 1 of the Sherman Act. Instead, it alleged that the USTA conspired with others to harm Super Sulky's business. In its response to the USTA's motion for summary judgment, however, Super Sulky argued for the first time that an intra-corporate liability theory was implicit in its pleading. The district court ruled otherwise, holding that it was "too late, three years into the case and far beyond the close of discovery, to attempt to construct a new legal argument."

After extensive briefing and a two-week trial, the jury returned a verdict in favor of Super Sulky. It made the following findings in response to specific interrogatories:

1. The plaintiff proved that the USTA conspired with one or more sulky manufacturers with the intent of banning the plaintiff's product from use in harness racing;

2. The plaintiff proved that the USTA's participation in the conspiracy and adoption of the sulky standard had a substantial effect on trade and commerce in the market for the purchase and sale of sulkies in the United States;

3. Given the first two findings, the USTA failed to prove that its adoption of the sulky standard was justified as a legitimate form of industry self-regulation;

4. The plaintiff proved that the USTA's unreasonable restraint of trade was a proximate cause of damages to the plaintiff's business;

5. The plaintiff proved that, given the finding of conspiracy, the USTA's conduct constituted tortious interference with the plaintiff's business relations;

6. The plaintiff proved that the tortious interference found in (5) proximately caused damages to the plaintiff's business;

7. The plaintiff proved that, given the finding of conspiracy, the USTA's conduct constituted tortious interference with the plaintiff's potential business relations; and

8. The plaintiff proved that the tortious interference found in (7) proximately caused damages to the plaintiff's business.

The jury awarded Super Sulky $650,000 in damages, which was tripled to $1,950,-000 under the Sherman Act. *See* 15 U.S.C. § 15. Shortly thereafter, the USTA filed a motion for judgment as a matter of law pursuant to Rule 50(b) of the Federal Rules of Civil Procedure, or, in the alternative, for a new trial pursuant to Rule 59. The district court granted both parts of the motion, concluding that no reasonable jury could find that the evidence presented at trial supported a finding of conspiracy between the USTA and sulky manufacturers. In addition, the district court held that, because the state law claims were predicated upon a finding of conspiracy, judgment as a matter of law was required as to the state claims as well.

Super Sulky filed a timely notice of appeal, and, by separate motion, requests us to certify to the Ohio Supreme Court the following questions of law:

1. Whether specific intent is an element of a claim for tortious interference with business relations;

2. Whether Ohio law follows the analysis set forth in the Restatement (Second) of Torts § 767, in determining whether the defendant's interference with the plaintiff's business relations is improper; and

3. Whether "conspiracy" is an element of claims for tortious interference with business relations.

## II.   ANALYSIS

### A.   Judgment as a matter of law on the Sherman Act claims

#### 1.   *Standard of review*

In reviewing a district court's decision to grant judgment as a matter of law under Rule 50(b) of the Federal Rules of Civil Procedure, the standard of review for issues arising under federal question jurisdiction is identical to that used by the district court. *K & T Enters., Inc. v. Zurich Ins. Co.*, 97 F.3d 171, 175 (6th Cir.1996). "The evidence should not be weighed. The credibility of the witnesses should not be questioned. The judgment of this court should not be substituted for that of the jury." *Id.* at 175–76. Instead, we must "view the evidence 'in the light most favorable to the party against whom the motion is made, drawing from that evidence all reasonable inferences in his favor.'" *Riverview Invs., Inc. v. Ottawa Community Improvement Corp.*, 899 F.2d 474, 482 (6th Cir.1990) (quoting *Morelock v. NCR Corp.*, 586 F.2d 1096, 1104 (6th Cir.1978)). On the other hand, the district court should be affirmed if reasonable minds could not come to a conclusion other than the one that the court reached. *See K & T Enters.*, 97 F.3d at 176.

#### 2. *Sherman Act § 1*

In granting judgment as a matter of law to the USTA, the district court held that "a reasonable jury could not have found the predicate upon which this case, as pleaded by the plaintiff, must rest, i.e., that the USTA conspired with one or more sulky manufacturers to restrain trade." The district court held that *Matsushita Electric Industrial Co., Ltd., v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (holding that a jury may not infer a § 1 Sherman Act conspiracy from evidence that is as consistent with

independent action as with conspiracy), and *Riverview Investments, Inc. v. Ottawa Community Improvement Corp.*, 899 F.2d 474 (6th Cir.1990) (same), are controlling because the evidence of conspiracy in the present case was "ambiguous." Super Sulky disagrees, arguing that there is unambiguous evidence of conspiracy in this case, making the proper standard that found in *United States v. General Motors Corp.*, 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966) (holding that joint, collaborative action by automobile dealers, their associations, and General Motors to deprive franchised dealers of the freedom to deal through discounters was an unlawful conspiracy in restraint of trade).

*Matsushita* defined ambiguous evidence as that which is "as consistent with permissible competition as with illegal conspiracy...." *Matsushita*, 475 U.S. at 588, 106 S.Ct. 1348. *General Motors*, on the other hand, held that conduct is actionable when the allegedly illegal actions are "joint and collaborative ... [and] pervasive in the initiation, execution, and fulfillment of the plan." *General Motors*, 384 U.S. at 143, 86 S.Ct. 1321.

We agree with the district court that no reasonable jury could conclude that the evidence in this case unambiguously supports the existence of a conspiracy. The same conclusion was reached by this court in *Riverview* under factual circumstances precisely parallel to those under review. In *Riverview*, a real estate developer brought an antitrust suit against a community improvement corporation that had refused to issue the industrial revenue bonds required for the development project. Without the bonds, the project failed. The developer alleged that the action of the corporation's board was a conspiracy to restrain trade, motivated by the individual interests of certain board members. After a jury verdict for the developer, the district court granted judgment as a matter of law in favor of the board, finding that the developer had failed to prove a conspiracy. This court affirmed, holding that each of the members who had voted against issuing the bonds had an independent reason to want the project stopped, without any agreement among the board members. *See Riverview*, 899 F.2d at 484. In other words, the parties in *Riverview* might well have shared a common objective, but that alone did not mean that their conduct should be evaluated by the same standard that applies to a ' case where there is unambiguous evidence of conspiracy.

*Riverview* ends with the following passage, quoted by the district court in the present case, that effectively forecloses Super Sulky's antitrust arguments on appeal:

Appellants claim that there was no evidence of independent action, that there was evidence of parallelism, that appellees had the opportunity to conspire, and that appellees' actions were consistent with a conspiracy to block competition. These arguments, however, misconstrue appellants' burden in proving the existence of a conspiracy under section 1. None of these arguments, even if accepted as true, tend to exclude the possibility of independent action. All may be *consistent* with conspiratorial conduct but, as noted throughout this opinion, proving that conduct is consistent with a conspiracy is not sufficient to allow an inference of conspiracy absent some evidence which tends to exclude the possibility that conduct is independent.

*Id.* at 485 (emphasis in original).

The same may be said about the present case. Super Sulky's conspiracy claim is based upon circumstantial evidence, coincidence, and speculation. The following six evidentiary points are proffered in support of its conspiracy allegations: (1) the panel discussion at the USTA annual meeting, where a Jerald executive was the only manufacturer's representative present, (2) the subsequent creation of the IWSC, (3) the allegedly "stacked" nature of the IWSC, (4) a meeting between a single IWSC member and two Jerald executives on the same day that

the first draft of the proposed specifications was discussed, (5) the personal friendships between Jerald executives and IWSC members, and (6) the fact that the IWSC's recommended sulky specifications were similar to the measurements of a Jerald sulky.

These points may be consistent with conspiratorial conduct, but Super Sulky has the burden of showing that the evidence is more consistent with conspiracy than with independent action. *See River-view*, 899 F.2d at 483. Furthermore, when the evidence is ambiguous, as it is here, the second step in the *Matsushita/River-view* analysis requires us to determine if there is "any evidence that tends to exclude the possibility that the defendants were pursuing these independent interests." *Id* (internal quotation marks omitted). Upon review, we find that the six items listed above do not, individually or collectively, meet Super Sulky's burden:

### i. Jerald's participation on the panel

The fact that a representative of the largest and best known sulky manufacturer would participate in a panel discussion of sulkies is entirely logical and by itself raises no inference of conspiracy.

### ii. Creation of the IWSC

The issue of sulky standardization was one of great importance to the harness-racing community. That a committee was created to examine the issue does not suggest a conspiracy.

### iii. The "stacked" nature of the IWSC

Super Sulky presented evidence that members of the IWSC had preconceived notions that cheetah-style sulkies were bad for harness racing. But it is altogether natural for members of the IWSC to feel strongly about the issue. The IWSC was not convened as a jury, but instead as a committee of knowledgeable people committed to the best interests of the sport. Had the panel been made up of other manufacturers, we would have a different situation. The fact that certain members of the panel disliked cheetah-style sulkies, however, does not tend to exclude independent action.

### iv. The meeting between Jerald and a committee member

Super Sulky makes much of a meeting between two Jerald executives and a single IWSC member, noting that it was held on the same day that the IWSC produced its draft measurements for the new "standardized" sulky. The purpose of this meeting is hotly contested. Granting all inferences in favor of Super Sulky, however, we must assume that the purpose of this meeting was in some way improper. But the fact that one member of the IWSC met with a manufacturer does not exclude a non-conspiratorial explanation for the IWSC's action, let alone the action of the 60–member Board of the USTA.

### v. Personal friendships

Personal friendships are natural in a discrete community like the harness-racing world. They do not amount to proof of conspiracy.

### vi. The selection of the traditional design as the standard

The IWSC was going to recommend standardizing the sulky along the lines of one of the established models. That Super Sulky lost does not exclude non-conspiratorial explanations, especially when the vast majority of the drivers indicated in a survey that they wanted the conventional-style sulky to be the standard.

After thoroughly reviewing the voluminous record in this case, we conclude that the evidence relied upon by Super Sulky to prove a conspiracy is as consistent with independent action as with a conspiracy. The likelihood of a conspiracy is further diminished by the fact that Jerald wrote at least one very angry letter to the IWSC pleading for quicker action, and participated in the formation of a "Sulky Manufac-

turing Association" that was being organized in opposition to the IWSC's actions. In sum, because Super Sulky failed to provide any evidence tending to exclude the possibility that the alleged conspiratorial conduct was in fact the result of independent action, the jury was not entitled to infer the existence of a conspiracy. The district court's grant of judgment as a matter of law to the USTA on all claims under the Sherman Act is therefore affirmed.

## B. Decision not to allow an alternate theory

Super Sulky complains that the district court erred when it ruled that Super Sulky could not pursue a theory of recovery at trial that was not raised until Super Sulky's response to the USTA's motion for summary judgment. Super Sulky argues that the claim was implicit in its pleadings, and that this court has in the past held that the refusal to allow such claims to go to trial is reversible error.

### 1. Standard of review

■ We review the district court's decision to prohibit a party from amending its pleadings for abuse of discretion. *See Estes v. Kentucky Utils. Co.,* 636 F.2d 1131, 1133 (6th Cir.1980). Although Super Sulky never formally moved to amend, Rule 15 of the Federal Rules of Civil Procedure sets forth no specific requirements for accomplishing that procedure. This court in the past has treated legal theories first raised in the plaintiff's response to a motion for summary judgment as an implicit motion to amend the complaint when all of the relevant facts had previously been pled. *See Tefft v. Seward,* 689 F.2d 637, 639–40 (6th Cir.1982) (finding that the district court abused its discretion in holding the plaintiff to an assault and battery charge and not considering a § 1983 claim based on identical facts).

■ We will find an abuse of discretion only when there is a "definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors." *Taylor v. United States Parole Comm'n,* 734 F.2d 1152, 1155 (6th Cir. 1984) (internal quotation marks omitted).

### 2. There was no abuse of discretion

■ An examination of the complaint makes clear that Super Sulky did not allege a theory of "conspiracy within the membership of the USTA" as part of its initial pleading. The complaint consistently refers to a conspiracy between the "defendants" (some sixteen individuals and corporations) and "others listed in paragraph 20" (fifteen individuals who allegedly participated in the conspiracy). A far-reaching conspiracy against Super Sulky is alleged, of which the USTA was only a single player. There is no mention of a conspiracy within the USTA itself. As the district court succinctly stated, "the complaint fails to reveal any hint of such a claim."

Super Sulky contends, however, that the district court abused its discretion when it did not permit Super Sulky to pursue this cause of action. Relying on this court's decision in *Tefft,* 689 F.2d at 640, Super Sulky argues that even though it had not pled this theory of recovery, it should be allowed to pursue it because "the purpose of pleading is to facilitate a proper decision on the merits," not "a game of skill in which one misstep by counsel may be decisive to the outcome." *Conley v. Gibson,* 355 U.S. 41, 48, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

■ But Super Sulky correctly states only half of the applicable legal standard. It is true that there are circumstances in which refusing to allow an amendment to the pleadings will constitute an abuse of discretion. *See Tefft,* 689 F.2d at 640. *Tefft* makes clear, however, that the facts of the case must show that "the amended cause of action is not so different as to cause prejudice to the defendants...."

*Id.* at 639. This is the other half of the applicable legal standard.

The dispositive question, therefore, is whether the district court abused its discretion in finding that the delay was prejudicial to the USTA. In *Tefft,* the court found no prejudice because it was "obvious that the facts as set forth" would support the new claim. *Id.* Here, however, the district court found that the USTA would be prejudiced because "a 'concerted action' claim is too large a matter to inject into the case at this point." The point in time to which the district court referred was "three years into the case and far beyond the close of discovery . . . ."

Super Sulky responds to the district court's finding of prejudice with the conclusory statement that "no new material inquiries of fact would be raised." But a concerted action claim in this case would focus on the conduct of the USTA itself, not on its interactions with other parties. The USTA would no longer be viewed as a single entity. Instead, the motives, actions, and conversations of individual members would take on greater significance, requiring new discovery.

Moreover, the case law in this area is unsettled. The Seventh Circuit, for example, has indicated that the notion of concerted action liability in the field of professional sports is at best confusing. *See Chicago Prof'l Sports Ltd. Partnership v. National Basketball Ass'n,* 95 F.3d 593 (7th Cir.1996) (holding that for antitrust purposes the N.B.A. is sufficiently integrated to be evaluated as a single entity). Given the radical change in direction contemplated by Super Sulky's concerted action claim, we are not left with the "definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors." *Taylor,* 734 F.2d at 1155. We therefore affirm the district court's decision prohibiting Super Sulky from belatedly pursuing such a claim.

### C. State law claims

Ohio law recognizes causes of action for both tortious interference with a business relationship and tortious interference with contract rights. *See A & B-Abell Elevator Co., Inc. v. Columbus/Central Ohio Bldg. & Constr. Trades Council,* 73 Ohio St.3d 1, 651 N.E.2d 1283, 1294 (1995). They differ only in that the former tort does not require proof of a contractual relationship. *See id.* "The torts of interference with business relationships and contract rights generally occur when a person, without a privilege to do so, induces or otherwise purposely causes a third person not to enter into or continue a business relation with another, or not to perform a contract with another." *Id.*

The district court granted the USTA judgment as a matter of law on Super Sulky's state law claims of tortious interference. This ruling was based in large part on the district court's legal conclusion that Super Sulky had failed to prove that the USTA had the "specific intent" to harm Super Sulky. On appeal, Super Sulky claims that the district court's reason for granting judgment as a matter of law was erroneous.

#### 1. *Standard of review*

A federal court exercising supplemental jurisdiction over state law claims is bound to apply the law of the forum state to the same extent as if it were exercising its diversity jurisdiction. *See Menuskin v. Williams,* 145 F.3d 755, 761 (6th Cir.1998). "In federal court diversity cases, this circuit adheres to the minority rule that state law governs the standard for granting motions for directed verdicts and judgments notwithstanding the verdict." *J.C. Wyckoff & Assoc., Inc., v. Standard Fire Ins. Co.,* 936 F.2d 1474, 1483 (6th Cir.1991). We therefore review the district court's grant of judgment as a matter of law using the same standards as would a state court in Ohio.

The Ohio Supreme Court has stated that a trial court's grant of a motion for judgment notwithstanding the verdict is reviewed *de novo:*

> The test to be applied by a trial court in ruling on a motion for judgment notwithstanding the verdict is the same test to be applied on a motion for a directed verdict. The evidence adduced at trial and the facts established by admissions in the pleadings and in the record must be construed most strongly in favor of the party against whom the motion is made, and, where there is substantial evidence to support his side of the case, upon which reasonable minds may reach different conclusions, the motion must be denied. Neither the weight of the evidence nor the credibility of the witnesses is for the court's determination in ruling upon either of the above motions.

*Gladon v. Greater Cleveland Reg'l Transit Auth.,* 75 Ohio St.3d 312, 662 N.E.2d 287, 294 (1996) (internal quotation marks omitted). We note that this standard is not substantially different from that used under Rule 50(b) of the Federal Rules of Civil Procedure.

### 2. Privileged conduct

One of the key elements in a tortious interference claim is the question of whether a defendant's actions were privileged. *See A & B–Abell,* 651 N.E.2d at 1294. Ohio law imposes the burden of proving "lack of privilege" or "improper interference" on the plaintiff. *See Kenty v. Transamerica Premium Ins. Co.,* 72 Ohio St.3d 415, 650 N.E.2d 863, 866 (1995) (formally recognizing tortious interference with a contractual relationship as actionable).

In interpreting Ohio law, this court has applied the definition of "improper interference" contained in § 767 of the Restatement (Second) of Torts. *See Kand Medical v. Freund Medical Products,* 963 F.2d 125, 128 (6th Cir.1992) (holding that under § 767, the conduct of a medical-devices distributor was privileged under Ohio law

because the conduct constituted lawful attempts to expand the defendant's business).

*Kand* sets forth the following seven factors to be considered in deciding whether the alleged conduct was privileged, all of which are drawn from § 767:

> (1) the nature of the actor's conduct, (2) the actor's motive, (3) the interests of the party with whom the actor has interfered, (4) the interests sought to be advanced by the actor, (5) the social interests of protecting the freedom of contracting and the interference with such, (6) the proximity or remoteness of the actor's conduct to the interference, and (7) the relations between the parties.

*Kand,* 963 F.2d at 128. The nature of the actor's conduct is the chief factor that the court should consider. *See* RESTATEMENT (SECOND) OF TORTS § 767 cmt c (1977).

In its post-verdict decision, the district court extensively discussed most of the above factors, albeit under the rubric of "specific intent" and without referring to § 767 as such. The district court's decision states, in essence, that because the USTA lacked the specific intent to harm Super Sulky, that the latter had not met its burden of proving a lack of privilege. In other words, because the "nature of the actor's conduct" (the first factor under § 767) showed no evidence of intent to harm Super Sulky, USTA's conduct was privileged. We agree.

The record reveals that the issue of sulky standardization was a controversial one in the industry. Comments to the USTA's Board indicated numerous reasons why members of the harness-racing community disliked cheetah-style sulkies. These included confusion among race fans, safety, cost, and the adverse effects that the new sulkies were having on the horses. The record is devoid of evidence upon which a reasonable jury could conclude that the USTA had any improper motive in banning cheetah-style sulkies. There was

a clear sentiment in favor of standardization. The USTA was in a situation where someone's ox was going to be gored no matter what standard it adopted. By necessity, the sales of non-conforming sulkies would be "interfered with" as a consequence of standardization. Perhaps the best proof of this fact is that virtually every sulky maker was equally apprehensive about the standardization process. Even Jerald, the industry leader and Super Sulky's chief competitor, was part of a group planning a "Sulky Manufacturing Association" to oppose the actions of the USTA. The record plainly shows that the USTA made a good-faith determination that the conventional-style sulky was best for the sport. As a result, the conduct of the USTA, the "chief factor" that courts should consider, strongly supports the USTA's privilege defense. *See* RESTATEMENT (SECOND) OF TORTS § 767 cmt. c (1977).

So too with the second factor, the USTA's motive. Not even Super Sulky alleges that the USTA's motive was to interfere with Super Sulky's business relationships (although it does allege as much with regard to Jerald).

The third factor, the interests of the party with whom the actor has interfered, is the only one that weighs in favor of Super Sulky. Super Sulky went from an industry leader to a defunct business within a matter of months.

The fourth factor, however, the interest sought to be advanced by the actor, clearly offsets the harm done to Super Sulky. As discussed above, the USTA sought to regulate harness racing for the benefit of the industry as a whole. All regulations, by definition, "interfere" with business relationships in the sense that by specifying what is acceptable, they make sales of that which is deemed unacceptable less likely. Such is the inevitable consequence of setting standards. The USTA's mission is to work for the good of the harness-racing industry as a whole. That mission would be rendered impossible if all promulgated regulations left it open to tortious interference claims.

The fifth factor, the social importance of contracts, is beyond dispute. As stated above, however, the USTA had no motive to harm Super Sulky. Instead, it was acting for the good of the harness-racing industry, an action that does not undermine the importance of contracts.

The sixth factor looks to the proximity of the conduct in causing the harm. Here it was the actions of the various state racing commissions that were directly responsible for Super Sulky's harm, because they are the ones that make the final choices as to what type of sulkies are to be used at each track. Although the USTA's actions are highly influential, its decisions in the present case were ultimately only recommendations to the state racing commissions.

The seventh and final factor to be considered is the relationship between the parties. Here the relationship was clearly at arm's length, as opposed to fiduciary in nature. There is also no evidence of fraud, misrepresentation, coercion, or threats, such being the type of conduct found objectionable in other cases. *See, e.g., Kand Med.*, 963 F.2d at 129.

In short, the USTA's conduct was the sort that all reasonable minds would find to be privileged. While it would have been preferable for the district court to focus on privilege rather than on "specific intent," and to explicitly lay out the balancing test set forth in Restatement § 767, it nonetheless reached the correct result when it found in favor of the USTA on this issue.

### 3. Specific v. general intent

Super Sulky also claims that the district court erred in holding that specific intent to harm is an element of a tortious interference claim under Ohio law. As explained above, we do not read the district court's opinion to state that specific intent is always an element of tortious interference claims under Ohio law. Rather, we

believe that the district court's focus on the USTA's lack of specific intent to harm Super Sulky was simply an alternate way of saying that the nature of the USTA's conduct and its motivations made its actions privileged as a matter of law. We therefore find it unnecessary to further discuss this issue.

## D. Certification

Finally, Super Sulky has asked this court to certify to the Ohio Supreme Court the questions of law set forth in Part I above.

### 1. Standards for certification

Rule XVIII of the Ohio Supreme Court Rules of Practice gives the Ohio Supreme Court discretion to answer questions of law certified to it by this court. To invoke the rule, we must decide that "there is a question of Ohio law that may be determinative of the proceeding and for which there is no controlling precedent" of the Ohio Supreme Court. OHIO SUP.CT. R. OF PRAC. XVIII, § 1; *see Scott v. Bank One Trust Co.*, 62 Ohio St.3d 39, 577 N.E.2d 1077 (1991) (holding that the Ohio Supreme Court has the power under the Ohio Constitution to answer questions certified to it by a federal court).

### 2. Proposed Question 1

The first question that Super Sulky seeks to have certified relates to the requisite showing of intent for tortious interference claims under Ohio law. As discussed above, the question of intent, although unresolved under Ohio law, is not determinative in this proceeding because there is no need for this court to reach it. The district court's ruling on the lack of "improper interference" was sufficient, by itself, to grant judgment for the USTA as a matter of law. We therefore decline to certify Question 1.

### 3. Proposed Question 2

Question 2 asks the Ohio Supreme Court to determine whether § 767 of the Re-

statement (Second) of Torts is the proper analysis for determining whether there was "improper interference" in a tortious interference claim. Unless and until the Ohio Supreme Court rules to the contrary, this is not an open question in this circuit. This court has previously applied § 767 as the prevailing Ohio law. *See Kand Med., Inc. v. Freund Med. Prod., Inc.*, 963 F.2d 125, 128 (6th Cir.1992). The district court's analysis of this issue, although it did not cite *Kand Medical*, was not contrary to § 767. There is thus no need to certify Question 2.

### 4. Proposed Question 3

Question 3 seeks to certify the issue of whether "conspiracy" is an element of a tortious interference claim under Ohio law. This appears to be another issue that has not been resolved by the Ohio Supreme Court. As with Super Sulky's other proposed questions, however, it would not be determinative of this appeal. Even assuming that the district court improperly required Super Sulky to prove conspiracy, we have concluded that the USTA's actions were privileged. That is sufficient, by itself, to affirm the district court's grant of judgment for the USTA as a matter of law. We therefore decline to certify Question 3 to the Ohio Supreme Court.

## III. CONCLUSION

For all of the reasons set forth above, the district court's grant of judgment to the USTA as a matter of law is **AFFIRMED**, and Super Sulky's motion to certify questions of law to the Ohio Supreme Court is **DENIED**.