E. Conrad HICKS, Jr., M.D., Plaintiff

v.

BRYAN MEDICAL GROUP, INC., et al., Defendants

No. 3:01 CV 7153.

United States District Court, N.D. Ohio, Eastern Division.

April 21, 2003.

Amy S. Glesius, Law Office of Christopher P. Thorman, Lynn A. Gross, Roetzel & Andress, Jack Landskroner, Landskroner Law Firm, Christopher P. Thorman, Law Office of Christopher P. Thorman, Cleveland, OH, for Plaintiff.

Jack G. Fynes, Shumaker, Loop & Kendrick, Timothy C. McCarthy, Shumaker, Loop & Kendrick, Rolf H. Scheidel, Shumaker, Loop & Kendrick, Toledo, OH,

Beth A. Sebaugh, Bonezzi Switzer Murphy & Polito, Cleveland, OH, for Defendants.

## ORDER

OLIVER, District Judge.

On March 29, 2001, Plaintiff E. Conrad Hicks, Jr., M.D. ("Hicks") filed the instant action against Defendants Bryan Medical Group, Inc. ("BMG") and Community Hospitals of Williams County, Inc. ("CHWC" or the "Hospital"), bringing claims of breach of contract, breach of fiduciary duty, wrongful discharge in violation of public policy, willful destruction of evidence, civil conspiracy, and tortious interference with a contract.[1] Both BMG and CHWC have filed motions for summary judgment, which are currently pending before the court (ECF Nos. 52 and 53). For the following reasons, both of these are granted in part and denied in part.

## I. FACTS

### A. The Parties

Hicks is a board certified obstetrician/gynecologist. In August of 1997, he began working at BMG, the physician practice group that staffs CHWC. The practice group is a closely-held corporation. At the time Hicks stopped working with BMG, he held a 1/29 interest in the corporation.

Hicks' employment with BMG was pursuant to an Employment Agreement. The Agreement set forth Hicks' duties as an employee of BMG and also provided for the manner in which he was to be compensated. Either party could terminate the Agreement without cause upon 90 days' written notice. The Agreement also provided that Hicks could be terminated without notice in a number of specified instances.

### B. The Hartman Litigation

In 1998, Hicks performed a caesarian section on Janice Hartman. Hartman's anesthesia was administered by one of CWHC's certified registered nurse anesthetists ("CRNA"). During the surgery, Hartman suffered an anesthesia-related injury which resulted in brain-death. It was determined that the alarms on the machines that monitored pulse oximetry readings had been turned off during her surgery. A lawsuit was filed against Hicks, BMG, the Hospital, and the CRNA who administered the anesthesia. Hicks was never disciplined by either BMG or the Hospital as a result of the Hartman litigation, although he ultimately settled the suit against him.

During the pendency of the Hartman litigation, Hicks learned from the CRNA's deposition testimony that he believed that Hicks was his supervisor in the operating room. Prior to this testimony, Hicks did not have "a real clear idea" as to who was supervising the nurse anesthetist during his surgeries. (Hicks Dep. of May 21, 2002 ("Hicks Dep. I") at 32).[2] He assumed that CRNAs could administer anesthesia on their own without the supervision of an anesthesiologist. On October 6, 1999, Hicks was deposed in the Hartman litigation. During his deposition, he testified that he was not qualified to take responsibility for, nor make decision about, delivery of anesthesia. Hicks' position with respect to anesthesia care was later seconded by another of BMG's physicians, Dr. Thomas Coon. Specifically, Coon wrote a letter to Rusty Brunicardi, the President

---

1. Originally, Hicks also brought a defamation claim. However, in his Brief in Opposition to the Defendants' Motions for Summary Judgment, he withdrew that claim. (*See* Hicks' Br. in Opp. at 14 n. 95).

2. CWHC's CRNAs had provided anesthesia services at each surgical procedure performed by Hicks during the 30 months that he performed surgeries at the Hospital.

of CWHC, on January 21, 2000, expressing his view that most physicians did not believe they should supervise the CRNAs during surgery. (Pl.'s Ex. 8, Letter of 1/21/2000 from Coon to Bruniardi) ("The testimony of the physician in question is probably an accurate reflection of the way most of us feel on the medical staff.").

### C. The Hospital's Medical Staff Bylaws and Ohio Law on CRNAs

CWHC's Medical Staff Bylaws contain a number of provisions regarding physicians' responsibilities with respect to nurse anesthetists. In relevant part, they provide:

Physician's Responsibilities:

\* \* \* \* \* \*

3. The physician Director of Anesthesia Service will be responsible for supervising the Nurse Anesthetist and will lend assistance when necessary.

\* \* \* \* \* \*

4. Cosign anesthetist's orders and discharge from Recovery Room.

5. The surgeon assumes ultimate responsibility for his patient in the operating room when anesthesia is administered by CRNA. The surgeons shall assume the role and responsibility of leadership in the event that a problem develops when the CRNA is administering anesthesia, until such time as other physicians are involved. Because physicians are immediately available, this responsibility may be transferred from the surgeon to another physician becoming involved due to the circumstances of events.

(CHWC Bylaws, § 13). These provisions are consistent with Ohio law on nurse anesthetists, which provides that CRNAs can only administer anesthesia "with the supervision and in the immediate presence of a physician." Ohio Rev.Code § 4731.43(B); *see also* Ohio Rev.Code § 4731.35. Prior to the Hartman litigation, Hicks was not aware of this requirement, nor had he reviewed the Hospital's Bylaws pertaining to the supervision of nurse anesthetists.

### D. Aftermath of Hartman

On October 21, 1999, Hicks wrote the Board of BMG regarding his concerns about supervising the CRNAs. In his letter, Hicks addressed the fact that the Hospital did not have a Director of Anesthesia Services despite the Hospital Bylaw mandating that such an individual was to supervise the CRNAs.[3] Hicks noted that "[t]his creates a situation where the hospital is attempting to shift responsibility for the delivery of safe anesthesia services onto my shoulders.... This is an untenable situation for me, and an unsafe one for my patients, as my training and qualifications do not support such responsibility." (Pl.'s Ex. 1, Letter of Oct. 21, 1999 from Hicks to BMG Board). Hicks requested that BMG hire a Physician Director of Anesthesia Services.

Although Hicks claims that his request went unanswered, BMG asserts that its Board responded by letter referring Hicks to the Hospital committees that monitor the quality of care at the Hospital, including anesthesia. The Board also assured Hicks that the Hospital and BMG had been recruiting an anesthesiologist "to assist with quality assurance monitoring as well as offer pain management and other services," but had "not yet found the right person offering these services." (Pl.'s Ex.

---

**3.** At the time Hicks wrote his letter, BMG and the Hospital had not had an anesthesiologist on staff since 1983.

4, Letter of Dec. 9, 1999 from Harrison to Hicks).

Thereafter, Hicks continued to complain about the lack of anesthesia supervision. He went to the home of a colleague who was on the Board of Directors to express his concerns and allegedly got no response. Hicks next wrote to Dr. Adnan Al–Khaleefa, a BMG doctor who was then serving as the Hospital's chief of staff, about his concerns arising out of the Hartman case. In his letter, Hicks reiterated that the Hospital considered him "to be supervising anesthesia services in any operating room setting" and requested Dr. Al–Khaleefa's assistance in obtaining a functioning Director of Anesthesia Services at the Hospital. Dr. Al–Khaleefa forwarded Hicks' letter to the Hospital's Board of Trustees and BMG's Board of Directors, stating in his cover letter that he was in favor of hiring an anesthesiologist. Finally, Hicks repeated his concerns about anesthesia care in a meeting with BMG's CEO, and again, allegedly received no response.

In mid-January, 2000, Brunicardi recommended to the Board of Trustees that Hicks be investigated under the Hospital's Peer Review guidelines in light of his deposition testimony in the Hartman litigation. Members of BMG formed the Executive Ad Hoc Committee responsible for conducting the investigation to determine whether Hicks' testimony violated the Hospital's Medical Staff Bylaws.

Shortly after this committee was formed, on January 21, 2000, Hicks reviewed Brunicadi's deposition transcript in the Hartman case. At his deposition, Brunicardi was asked what he would say to a surgeon who stated that he was not qualified to supervise anesthesia in cases at the Hospital. Brunicardi responded that he would tell the physician to cancel his surgeries. Hicks regarded Brunicardi's testimony as outrageous and decided to stop performing surgeries at the Hospital. He called in sick the entire week of January 24, 2000. On January 31, 2000, he and his wife flew to Melbourne, Florida, for an employment interview.

The Executive Committee ultimately exonerated Hicks. The Committee concluded that "the Statement made by E. Conrad Hicks in the course of a deposition given on or about October 6, 1999 was not in conflict with the Medical Staff Bylaws" and determined that "no further investigation is indicated at this time." (Pl.'s Ex. 31, Jan. 26, 2000 CWHC Minutes of Meeting of Medical Staff Executive Committee). Hicks claims that, nevertheless, the Committee thereafter attempted to coerce him into signing anesthesia records he did not approve. He asserts that the Committee did so in an effort to cause Hicks to lose his Hospital privileges for signing orders he was not qualified to sign. Specifically, Hicks claims that Al–Khaleeta told him he had to sign pre-anesthetic evaluations and anesthetist orders and documentation for surgical procedures. Hicks refused, believing he was unqualified to do so; instead, he wrote "noted, not approved" on the charts.

Hicks claims that Brunicardi and Sharon Mesnard, the Hospital's Director of Quality Improvement/Risk Management, next used the Quality Assurance Committee, made up of BMG members, to investigate Hicks' record-signing practices. Specifically, the Committee was asked to evaluate Hicks' anesthesia records and submit a report regarding his record-signing practices. Brunicardi told Mesnard that the medical executive committee wanted a compilation of the medical record deficits for Hicks. Mesnard's report concluded that Hicks "had a lot of deficient records ... because he wasn't signing the records, the anesthesia record." (Mesnard Dep. at 37). She also noted that the Hospital

could not "bill until the medical records [were] complete." (*Id.*). Once the Hospital learned that Hicks intended to leave BMG, (*see* discussion in Section I.F. below), it dropped its objections to his record signing practices.

According to Hicks, the Quality Assurance Committee was also used to conduct other investigations of patient care issues with regard to him. He claims that under the guise of "quality assurance," employees of the Hospital called Hicks' patients to encourage them to complain about Hicks' care. In one case, Hicks received a notice from the Patient Care Committee that a patient he had operated on complained about him. When Hicks contacted the patient, she allegedly stated that she received a call from a registered nurse at the Hospital who asked her about her satisfaction with Hicks' care. Despite informing the nurse that she was happy with Dr. Hicks, she felt that she was being pushed to say something negative about Hicks.

Likewise, Hicks asserts that after his testimony in Hartman, one of his partners discouraged at least one patient, Amy Kruse, from treating with him. Dr. Carrico, a BMG member, discussed Kruse's decision to continue seeing Hicks with her after he delivered her first child. He told her, "as your doctor, I strongly advise you not to see Dr. Hicks anymore." (Kruse Dep. at 92).

Hicks further maintains that the Hospital and BMG treated him worse than other physicians who were unqualified to administer anesthesia-related sedation. For example, Coon, who admitted he was not qualified to administer anesthesia-related sedation, was never investigated as Hicks had been. Similarly, a podiatrist, who worked at the Hospital but was not a BMG shareholder, was assured by Brunicardi that he was not in charge during surgery. Indeed, he points to the fact that Mesnard could not identify any physician who had been investigated in the same manner as Hicks.

## E. Spoliation of Evidence

In addition to investigating him as a result of his testimony in Hartman, Hicks claims that the Defendants altered his application for privileges with the Hospital and asked him to destroy records in Hartman's file. With respect to this latter charge, Hicks maintains that a few days after the Hartman surgery, he made an entry on her medical chart describing a conversation with a surgical technician who was present during the surgery. On January 7, 1999, Brunicardi called Hicks and asked that he remove the note from Hartman's chart "before a lawsuit gets filed." (Hicks Dep. I at 80). Hicks never removed the note from Hartman's file.

As for his charge that the Hospital altered his application for privileges, Hicks states that when he applied for privileges at the Hospital, he applied only for the privileges for which he was qualified. Specifically, he did not apply for privileges to "administer procedure related sedation." However, he claims that in light of the Hartman litigation, the Hospital altered his application by checking the box indicating that he was applying for such privileges. Expert testing performed on the privileges application has revealed that the checkmark next to the "administer procedure related sedation" privilege request is, in fact, of a different ink that the checkmarks on the remainder of the application. According to Hicks, the Hospital altered his privileges application to make it appear that he had indicated he was qualified to do work he was not qualified to do. He maintains this was done in an effort to foist liability on him in the Hartman litigation. Because he would have risked losing insurance coverage if he had raised the issue of the alteration of his privileges,

Hicks asserts that he was ultimately required to settle the Hartman litigation.

### F. Hicks' Separation from BMG

On February 29, 2000, Hicks realized that his customary advance against his quarterly compensation had not been deposited into his account and that he would not be receiving his monthly car allowance. When Hicks inquired about the matter, he was informed that BMG was not paying him his February advance because he was no longer performing hospital services or taking call and his net production for the month amounted to approximately $2,000. According to BMG, deductions for overhead and procedures and services not directly performed by Hicks reduced the compensation it owed him for the month of February to a negative number. It further maintains that Hicks owed the corporation $11,042 for an overpayment in 1999 compensation.

Hicks' last day at BMG was March 17, 2000. Prior to leaving, he signed an agreement whereby he was paid $10,000 for his March services. Thereafter, he joined Northeast OB–GYN in Fort Wayne, Indiana. Hicks has since left that practice and now resides in Tucson, Arizona. Hicks maintains that after he left BMG, his earnings went from in excess of $400,000 per year to approximately $200,000 per year.

## II. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) sets forth the standard for summary judgment: "The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law ...."

In reviewing summary judgment motions, this court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943–44 (6th Cir.1990). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases, the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id.* at 252, 106 S.Ct. 2505.

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Moreover, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir.1989) (citing *Frito–Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C.Cir.1988)). The non-moving party is under an affirmative duty to point out specific facts in the record which create a genuine issue of material fact. *Fulson v. City of Columbus*, 801 F.Supp. 1, 4 (S.D.Ohio 1992). The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts. *Id.*

## III. LAW AND ANALYSIS

### A. Breach of Contract

■ Hicks brings his breach of contract claim against BMG only. In this claim, Hicks asserts that BMG breached its obligations under the Employment Agreement when it stopped paying him his monthly draw in February of 2000. According to Hicks, this constituted a termination of the Agreement without cause and without the required 90 days' written notice. BMG argues that it is entitled to summary judgment on the claim because Hicks stopped performing his services under the Agreement when he ceased performing surgeries and because he decided to leave BMG of his own accord. Although Hicks has presented little more than a scintilla of evidence to support this cause of action, he has presented enough evidence to create genuine issues of material fact with respect to both of BMG's arguments. Accordingly, BMG is not entitled to summary judgment on this claim. In order to establish a claim for breach of contract, a plaintiff must prove: (1) the existence of a binding contract or agreement; (2) that he performed his contractual obligations; (3) that the other party failed to fulfill its contractual obligations without legal excuse; and (4) he suffered damages as a result of the breach. *Lawrence v. Lorain Cty. Community College,* 127 Ohio App.3d 546, 713 N.E.2d 478 (1998) (quoting *Garofalo v. Chicago Title Ins. Co.,* 104 Ohio App.3d 95, 661 N.E.2d 218, 226 (1995)). Here, Hicks can easily establish the first element of his claim as he entered into the Employment Agreement with BMG before he began working with the physicians' group. However, the other three elements require more analysis.

### 1. *Hicks' Obligations*

Hicks' obligations under the Employment Agreement are outlined in the Agreement. Specifically, Hicks was "employed as a physician and agree[d] to perform such duties as a physician as [were] assigned to him by the Board of Directors, or a committee, or the officers of [BMG] . . . ." (Agreement ¶ 2). He was to at all times "promote the best welfare of [BMG] and to perform faithfully to the fullest extent of his ability all his duties under th[e] Agreement, as well as the treatment and diagnosis of those patients assigned to him by [BMG]." (*Id.*) Hicks agreed to follow BMG's "policies, standards and regulations [and to] . . . abide by the rules established by [BMG]." (*Id.* at ¶ 4). Some of his specific duties included:

Conducting the practice of medicine according to good medical practice and in accordance with such principles as may be approved and established by the Board of Directors;

Maintain[ing] proper clinical records and such other reports as may be required by the Board of Directors;

Maintain[ing] high medical and moral ethics; and

Confin[ing] his medical practice to the field of obstetrics/gynecology and such additional or alternative activities as may be approved by the Board of Directors.

(Agreement ¶ 6).

Hicks claims that he performed his obligations under the Employment Agreement through March 17, 2000, although he stopped performing surgeries in January of that year when he learned of Brunicardi's testimony in the Hartman litigation. Specifically, Hicks maintains that he continued to see patients even after he decided that it would no longer be safe for him to continue performing surgeries without the proper qualifications for overseeing the nurse anesthetists.

According to BMG, Hicks stopped performing his duties under the Agreement when he decided to cease performing sur-

geries in January of 2000. Moreover, it claims that Hicks voluntarily decided to terminate his relationship with BMG. As support for this latter claim, BMG cites to the following facts: (1) Hicks called in sick and performed no services at all from January 24, to February 3, 2000; (2) Hicks flew to Florida for an employment interview on January 31, 2000, and subsequently entered into an employment agreement; (3) upon his return to BMG on February 3, 2000, Hicks informed BMG's CEO that he was leaving BMG and had retained counsel to negotiate the terms of his separation; and (4) on February 11, 2000, Hicks began transferring his patients to other BMG obstetricians-gynecologists and confirmed that his attorney had been in contact with BMG's attorney. It also cites to a letter that Hicks wrote to the BMG shareholders on March 7, 2000, where Hicks described his separation from BMG as follows:

> I want to be clear that BMG Administration, and I assume the Board Members, have been aware of my desire to disengage, and of the reasons for my choosing to disengage, since the start of February. There has seemed to be, following from recognition by both sides of the nature of my conundrum here, a consensus that there is no need for a ninety-day notification period before leaving, as my contract calls for.

(BMG's Mot. for Summ. J. at 7) (quoting Def. Ex. 8, Hicks Deposition of September 5, 2002 ("Hicks Dep. II") at 335).[4]

■ Considering the evidence in a light most favorable to Hicks, he has provided sufficient evidence to establish that he was performing his duties under the Employment Agreement at the time BMG stopped

paying him his monthly draw. BMG does not dispute that he continued to see patients subsequent to February of 2000, despite the fact that he ceased doing surgeries. Nor has BMG cited to any portion of the Employment Agreement which mandated that Hicks perform surgeries as part of his duties. If anything, Hicks' decision to stop such services because he was unqualified to oversee nurse anesthetists may be viewed as comporting with his obligation to "perform faithfully to the fullest extent of his ability all his duties under th[e] Agreement, as well as the treatment and diagnosis of ... patients" and to "maintain high medical and moral ethics."

The court finds that there is likewise a question of fact as to whether Hicks voluntarily terminated his relationship with BMG, although Hicks has provided barely more than a scintilla of evidence that he did not. According to Hicks, even before BMG gave him no monthly draw for February of 2000, it had embarked "on a campaign to drive [him] out." (Hicks' Br. in Opp. at 8). (After the Hartman litigation, his fellow BMG members conducted an investigation to determine whether he violated the Hospital's Bylaws by testifying that he was not qualified to oversee nurse anesthetists.) Although he was ultimately exonerated, the Hospital's Chief of Staff, a BMG member, thereafter told Hicks he had to sign pre-anesthetic evaluations and anesthetist orders and documentation for surgical procedures even though he was not qualified to sign the records. At the same time the Chief of Staff was urging him to do so, the Quality Assurance Committee, again comprised of BMG members, initiated an investigation into Hicks' rec-

4. The court notes that BMG did not submit Defendants' Exhibit 8 to Hicks' Deposition in the evidentiary materials it supplied in support of its Motion for Summary Judgment. However, Hicks has not challenged the accuracy of BMG's quotation of the letter in its

motion. Moreover, in his deposition, Hicks responded to questions about the letter in a manner which would indicate that it has been accurately quoted by BMG. Accordingly, the court will consider the letter in ruling on BMG's Motion for Summary Judgment.

ord-signing practices. His partners also began discouraging patients to treat with Hicks. When BMG failed to pay him his monthly draw in February, Hicks felt he had no choice but to terminate his relationship with BMG. Finally, viewing the evidence in a light most favorable to Hicks, BMG had already forced Hicks to leave at the time he wrote the BMG shareholders on March 7, thereby rendering his letter essentially moot.

Although a jury would be well within its discretion to decide that Hicks had voluntarily decided to leave BMG before BMG failed to pay him his monthly draw in February, there is at least an issue of fact on this element of Hicks' breach of contract claim.[5]

### 2. *BMG's Obligations*

Hicks' right to compensation under the Employment Agreement is set forth in Paragraph 3(b) of the Agreement, which provides:

> [T]he Employee's compensation shall be determined by the Incentive Distribution Plan that is set forth in Exhibit A attached hereto, as it shall be amended from time to time by the Board of Directors of the Employer. The Employee shall be paid a monthly draw amount that is determined by the Board of Directors of the Employer from time to time, which will constitute an advance to be credited against the Employee's quarterly compensation.... Any excess of advances taken by the Employee shall be reimbursed to the Employer.

(Agreement ¶ 3(b)). The Incentive Distribution Plan specifically provided that "[s]hould one run a deficit (paid out to date exceeds what's due) an adjustment to monthly draw will be made." BMG argues that because Hicks' net revenue for February was only $2,000 and Hicks owed BMG more than $11,000 for the previous year, its decision not to advance Hicks $18,500 against his quarterly compensation was not a breach of the Employment Agreement.

On review, the court finds there is sufficient evidence in the record from which a reasonable jury could conclude that BMG breached the Employment Agreement by not paying Hicks his monthly draw in February of 2000. Hicks has presented evidence that BMG's decision to pay Hicks nothing for this month was not because Hicks' productivity for the month was so low or that Hicks owed BMG for the previous year but rather was because BMG believed that Hicks' future productivity was "not going to meet with the amount of payment." *See* (Jain Dep. at 30). Though the BMG Board of Directors clearly retained a significant amount of discretion in determining Hicks' monthly draw, the Agreement can also be interpreted as requiring that Hicks be paid *some* amount as a monthly draw (*i.e.*, "[t]he Employee shall be paid a monthly draw amount"). Such an interpretation of the Agreement is borne out by the fact that BMG had never before reduced the pay of a physician to nothing. Even the fact that the Agreement provided that "excess of advances taken by the Employee [were to] ... be reimbursed to the Employer" could be interpreted to mean that even if Hicks owed BMG some money for 1999, he would still receive his usual monthly draw but would

---

**5.** The court notes that it appears that Hicks has attempted in his Brief in Opposition to BMG's Motion for Summary Judgment to turn his breach of contract claim into a constructive discharge claim without explicitly stating so and without actually pleading such a claim in his Complaint. (*See* Hicks' Br. in Opp. at 19 n. 123). However, BMG has not objected to Hicks' characterization of his breach of contract claim as such. Consequently, the court has treated the claim and the evidence in the manner presented by the parties.

later have to remit some amount to BMG. Likewise, the fact that BMG paid Hicks his monthly draw for January of 2000 even though he owed some amount for 1999 would corroborate such an interpretation.

Consequently, Hicks has satisfied the third element of his breach of contract claim.

### 3. *Hicks' Damages*

Though none of the evidence that Hicks has presented in support of his breach of contract claim is particularly strong, perhaps the weakest is that which he provides in support of the damages he suffered as a result of BMG's alleged breach. In fact, he entirely disregards BMG's argument in its Motion for Summary Judgment that he has suffered *no* damages. Nevertheless, the court finds that it cannot grant summary judgment on this basis.

First, the evidence is not altogether clear that Hicks is not entitled to any amount for the work he performed in February of 2000. Second, Hicks claims that BMG also failed to pay his car allowance for February of 2000; BMG has not addressed this contention. Finally, the Ohio Supreme Court has recently held that "[i]f a plaintiff proves breach of contract at trial but fails to prove actual damages resulting from that breach, the trial court may enter judgment for the plaintiff and award nominal damages." *DeCastro v. Wellston City School Dist. Bd. of Educ.*, 94 Ohio St.3d 197, 761 N.E.2d 612 (Ohio 2002).[6]

Beyond these minimal amounts, it is unclear what damages, if any, Hicks would be entitled to as a result of any alleged breach by BMG. It appears that at most, Hicks would be entitled to 90 days' pay, as that was the notice period for termination without cause provided for in his Employment Agreement. However, he apparently agreed to accept $10,000 in satisfaction of any compensation claim he would have for at least March of 2000. (*See* Memo of March 30, 2000 from Simon to Hicks, Pl.'s Exhibit 25). Indeed, it may be that this agreement was intended to be in satisfaction of *all* damages to which Hicks would otherwise be entitled. *See Board of Comm'rs of Columbiana County v. Samuelson*, 24 Ohio St.3d 62, 63–64, 493 N.E.2d 245 (1986). However, because neither BMG nor Hicks fully addressed this issue, the court will not assume that this was the intent of the parties in entering into the agreement.

Accordingly, because Hicks has produced some evidence to establish each of the elements of his breach of contract claim, BMG's Motion for Summary Judgment on this claim is hereby denied.[7]

### B. Breach of Fiduciary Duties

Next, Hicks asserts a claim for breach of fiduciary duties against BMG. Specifically, Hicks claims that BMG breached the fidu-

---

**6.** The court in *DeCastro* also held that "summary judgment may be granted to the defendant in a breach of contract case where the plaintiff has failed to provide evidence of economic damages resulting from a breach of contract and has failed to seek injunctive relief or specific performance of a contractual duty, but instead rests his or right to proceed to trial solely on a claim for nominal damages." *Id.* at 617. However, that is not the case here as Hicks has some, albeit very little, evidence of economic damages.

**7.** In support of his breach of contract claim, Hicks also argues that BMG breached the covenant of good faith and fair dealing implicit in his contract. The court has not considered this argument in ruling on BMG's Motion for Summary Judgment because Hicks did not bring a claim for breach of the covenant of good faith and fair dealing in his Complaint. More importantly, Ohio courts have "consistently refused to recognize such a cause of action in the employment context." *Francis v. Gaylord Container Corp.*, 837 F.Supp. 858, 862 (S.D.Ohio 1992) (citing cases).

ciary duty it owed Hicks as a minority shareholder: (1) when it terminated him without just cause and (2) when his fellow BMG shareholders "used their positions at the Hospital to investigate Hicks for following his obligation for patient care over profit." (Hicks' Br. in Opp. at 23). BMG moves for summary judgment, arguing that his claim that BMG terminated him without just cause is duplicative of his breach of contract claim and that he waived the right to bring such a claim by entering in the Employment Agreement which allowed BMG to terminate him without cause. With respect to Hicks' allegations regarding the investigations, BMG maintains that it is entitled to summary judgment because: (1) it did not initiate and played no role in the investigations; (2) the investigations were legitimate in light of Hicks' testimony in the Hartman litigation and his failure to cosign anesthetist's orders as mandated by the Hospital's bylaws; and (3) the Hospital committees investigating him exonerated Hicks with respect to his deposition testimony and dropped their objections to his qualified signatures on the anesthesia records. For the following reasons, the court grants BMG's motion for summary judgment on this claim.

█ In Ohio, majority shareholders in a close corporation have a fiduciary duty to minority shareholders. *Crosby v. Beam,* 47 Ohio St.3d 105, 108, 548 N.E.2d 217 (Ohio 1989). The duty, which is one of "utmost good faith and loyalty," is "similar to the duty that partners owe one another in a partnership because of the fundamental resemblance between the close corporation and a partnership." *Id.* Majority shareholders breach their fiduciary duty to minority shareholders when they "utiliz[e] their majority control of the corporation to their own advantage, without providing minority shareholders with an equal opportunity to benefit, ... absent any legitimate

business purpose...." *Id.,* syl. ¶ 2, 548 N.E.2d 217.

In *Cruz v. South Dayton Urological Assoc.,* 121 Ohio App.3d 655, 700 N.E.2d 675 (Ohio Ct.App.1997), Cruz brought a claim for breach of fiduciary duty based in part on his allegation that the majority shareholders in his closely held corporation had terminated him without just cause. The court of appeals found the trial court appropriately granted summary judgment to the majority shareholders on the ground that Cruz had entered into an employment agreement allowing the corporation to terminate him without specification of cause. *Id.* at 663, 700 N.E.2d 675. According to the court, "[i]n so doing, Cruz waived his right to argue that the defendants breached their fiduciary duty to him because they lacked a legitimate business reason for their action." *Id.*

█ For the same reason, Hicks' argument that BMG breached its fiduciary duty to him when it allegedly terminated him without just cause fails. When he signed the Employment Agreement, which provides that he can be terminated without cause, "he relieved [BMG] ... of any duty [it] ... owed him to exercise [its] ... power of termination only for good cause." *Id.* Accordingly, BMG's motion for summary judgment on this basis is granted.

█ BMG is also entitled to summary judgment on Hicks' claim that it breached its fiduciary duty to him by investigating him for his testimony in the Hartman litigation and for his record signing practices. Hicks does not dispute that the investigations were initiated by the Hospital, not BMG. Indeed, as discussed below, Hicks' claim for tortious interference with a contract is dependent on the fact that the Hospital initiated the investigations. While Hicks asserts that BMG shareholders participated in the investigations, he has not brought any cause of action

against his fellow shareholders; his claim is clearly brought against BMG only. Nor has Hicks cited any case law which would allow him to impute the actions of the shareholders to BMG when it is undisputed that BMG did not choose to undertake the investigations. Moreover, to the extent BMG would be implicated by the shareholders' participation in the investigations, it had legitimate business reasons for investigating Hicks. Despite the Hospital bylaw which set forth that physicians assume ultimate responsibility for their patients in the operating room when anesthesia is administered by a CRNA, Hicks testified in the Hartman litigation that he was not qualified to do so. He also refused to cosign anesthetist's orders as mandated by another of the Hospital's by-laws. Finally, as BMG points out, Hicks was ultimately exonerated by the Hospital committee investigating him as a result of the Hartman matter, and the objections with respect to his qualified signatures on the anesthetists' orders were dropped.

Consequently, BMG is entitled to judgment as a matter of law on Hicks' breach of fiduciary duty claim.

## C. Wrongful Discharge in Violation of Public Policy

■ Count III of Hicks' Complaint alleges wrongful termination in violation of public policy against both BMG and CWHC. In Ohio, an employer may not discharge an at-will employee in violation of a statute or in contravention of clear public policy. *Greeley v. Miami Valley Maint. Contractors Inc.*, 49 Ohio St.3d 228, 551 N.E.2d 981 (1990). The evolving law of public policy torts in Ohio was clarified by the Ohio Supreme Court in *Kulch v. Structural Fibers, Inc.*, 78 Ohio St.3d 134, 677 N.E.2d 308 (1997). To make out a claim for wrongful discharge in violation of public policy, a plaintiff must demonstrate the following: (1) that a clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the clarity element); (2) that dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the jeopardy element); (3) the plaintiff's dismissal was motivated by conduct related to the public policy (the causation element); and (4) the employer lacked overriding legitimate business justification for the dismissal (the overriding justification element). *Kulch,* 677 N.E.2d at 308. "Clarity" and "jeopardy" are questions of law to be determined by the court, and "causation" and "overriding justification" are questions of fact for the jury. *Collins v. Rizkana,* 73 Ohio St.3d 65, 70, 652 N.E.2d 653, 658 (Ohio 1995).

### 1. *BMG Liability*

■ BMG argues that this claim must fail because Hicks was not an at-will employee. "In order for an employee to bring a cause of action pursuant to *Greeley,* ... that employee must have been an employee at will. The identifying characteristic of an employment-at-will relationship is that either the employer or the employee may terminate the employment relationship for any reason which is not contrary to law." *Haynes v. Zoological Soc. of Cincinnati,* 73 Ohio St.3d 254, 652 N.E.2d 948, 951 (1995). Paragraph 16 of Hicks' employment contract provides:

*Termination Without Cause.* Either party may voluntarily terminate this agreement effective at any time by giving written notice to the other party at least 90 days prior to the effective date of termination, unless a shorter period is mutually agreed upon.

The court finds that because this provision permitted either party to terminate Hicks' employment for any reason, Hicks was an at-will employee. *See Northwest Fin.*

*Agency v. Transamerica Occidental Life Ins. Co.*, 773 F.Supp. 75, 79 (S.D.Ohio 1991)= (holding that plaintiff was an employee at will where his employment contract allowed him to be terminated without cause upon sixty days' notice).

Under the clarity element, Hicks contends that the public policy at stake in this case is that of retaliating against employees for giving truthful testimony in a proceeding. Specifically, he relies on O.R.C. §§ 2921.11 and 2921.13 which criminalize perjury and falsification. In *Sabo v. Schott*, the Ohio Supreme Court held that if an employee is "fired as a result of having testified truthfully, albeit unfavorably to the defendants, if proven to be true, [it] would constitute conduct on the part of the [employer] ... which violates the public policy of this state." 70 Ohio St.3d 527, 639 N.E.2d 783; *see also Collins*, 73 Ohio St.3d at 71, 652 N.E.2d at 658–659 ("employees discharged for refusal to participate in activities which arguably violate criminal laws have a claim for wrongful discharge in violation of public policy."). Thus, Hicks has established the first element of this claim.

Likewise, the jeopardy element is satisfied in this case because Hicks does not have any alternative remedies for his claim that he was wrongfully terminated in violation of public policy. His breach of contract claim cannot serve as his remedy because that claim does not address the public policy at stake. Hicks also correctly points out that his claim is based on the criminal perjury and falsification statutes, which do not provide him with a cause of action for their violation. Thus, the jeopardy element is satisfied.

■ As to the third element, causation, the closeness in time between the events of Hartman and Hicks' departure from BMG raises an inference of causation. *See Barnes v. Cadiz*, 2002 WL 925040 at *4 ("proximity in time between the event and the termination ... has relevance with regard to the element of causation."). Based on the evidence Hicks has presented, the court finds that a genuine issue of material fact as to whether the true motivation behind the discharge was in retaliation for Hicks' actions in Hartman. Similarly, under the fourth element, a genuine issue of material fact exists as to whether BMG lacked an overriding business justification for Hicks' termination. Though BMG has an interest in ensuring that its patients receive the safe administration of anesthesia, a reasonable jury could infer from the fact that BMG did not investigate or terminate other physicians who felt they were unqualified to supervise nurse anesthetists that BMG's alleged termination of Hicks was not due to his lack of such qualifications but rather was due to his testimony in the Hartman litigation.

### 2. Hospital Liability

Hicks also contends that the Hospital should also be held liable for his wrongful termination in violation of public policy claim. He first argues that the Hospital should be considered a joint tortfeasor because it actively participated and contributed to his termination. The court does not find this argument persuasive. The elements in *Greeley* are specifically directed to the relationship between employers and employees. Moreover, Hicks has cited no authority for the proposition that a non-employer may be considered a joint tortfeasor for purposes of a wrongful discharge action.

■ Alternatively, Hicks argues that the Hospital should be considered a joint employer based on the degree of control it exerted over Hicks. The court also finds this argument unpersuasive. The cases Hicks relies on to support his joint employer theory all concern causes of action under Title VII. *See e.g. E.E.O.C. v.*

*Wooster Brush Co. Employees Relief Ass'n*, 727 F.2d 566, 571–72 (6th Cir.1984). He cites to no authority under Ohio law extending this principle beyond the Title VII context or to circumstances similar to those presented in this case. Thus, the court concludes that the Hospital does not share in the liability for Hicks' wrongful termination claim. Accordingly, BMG's Motion for Summary Judgment is denied and the Hospital's Motion is granted with respect to Hicks' wrongful termination claim.

### D. Spoliation of Evidence

■ In *Smith v. Howard Johnson Co., Inc.*, 67 Ohio St.3d 28, 615 N.E.2d 1037 (Ohio 1993), the Ohio Supreme Court acknowledged a cause of action for spoliation of evidence. The elements of this claim include: (1) pending or probable litigation involving the plaintiff; (2) knowledge on the part of defendant that litigation exists or is probable; (3) willful destruction of evidence by defendant designed to disrupt the plaintiff's case; (4) disruption of the plaintiff's case; and (5) damages proximately caused by the defendant's acts. *Smith*, 67 Ohio St.3d at 29, 615 N.E.2d at 1038. Several courts, including *Smith*, have acknowledged that this claim encompasses both interference with or destruction of evidence. *Id.; Drawl v. Cornicelli*, 124 Ohio App.3d 562, 567–68, 706 N.E.2d 849, 852 (1997) (the term "spoliation" encompasses not only destruction of evidence but also "significant and meaningful alteration" and thus includes the concept of interference with evidence).

Hicks relies on three incidences to support his spoliation claim.[8] First, he alleges that the Hospital destroyed evidence in this case when its expert removed a portion of the checkmark on his privilege application to test the altered checkmark against an authentic one. As the Hospital has agreed to provide Hicks' with the results of its expert's testing, this claim is moot. Second, Hicks claims that the Hospital asked him to remove a note he added to Hartman's medical file in an effort to destroy evidence in the Hartman litigation. Because Hicks admits that he refused to remove the note from the medical file, no alteration or destruction of evidence occurred.

Lastly, Hicks contends that in response to the Hartman action, the Hospital altered his privileges application by checking the box indicating that he was applying for privileges to "administer procedure related to sedation" when Hicks did not apply for this privilege. As to the first two elements, the Hartman lawsuit qualifies as a pending litigation involving Hicks of which the Hospital was aware. Under the third element, Hicks must show that the Hospital willfully altered evidence, which "contemplates not only an intentional commission of the act, but also a wrongful commission of the act." *Drawl*, 124 Ohio App.3d at 566, 706 N.E.2d at 851. To establish the Hospital's willful alteration of his privileges application, Hicks points to his deposition testimony where he states that he did not request the privilege to "administer procedure related to sedation" when he initially completed the application. (Hicks Dep. I at 156–57). He also notes that the Hospital does not dispute that the application was altered, as the custodian of the original application has stipulated that the checkmark regarding the privilege to "administer procedure related to sedation" is a different ink than the other checkmarks on Hicks' application for other privileges. Likewise, there

---

8. Hicks has failed to address BMG's assertion that the spoliation of evidence claim applies only to the Hospital. Because Hicks has not offered an evidence creating a genuine issue of material fact as to BMG, it is entitled to judgment as a matter of law on this claim.

is no dispute that Hicks' original privileges application was in the sole custody and control of the Hospital in its records department. He also maintains that the Hospital altered the application to make it appear as if Hicks were qualified to administer sedation procedures, so that liability in the Hartman action would be shifted from the Hospital to Hicks. From this evidence, a reasonable jury could infer that the Hospital wilfully altered the application in order to disrupt the Hartman action.

The fourth and fifth elements require Hicks to show that there was disruption of his case resulting in damages. Hicks states that the Hospital's alteration cast him in a negative light in the Hartman action and that he was damaged as a result. The Hospital claims that Hicks knowingly and voluntarily settled the Hartman case and thus any alteration to his application did not damage Hicks. The court finds that a reasonable jury could conclude that the alteration to Hicks' privilege application was a disruption in the Hartman case and that Hicks was damaged because of the alteration. Had the application not been altered, Hicks may have settled for less than he did or may not have agreed to settle at all. Accordingly, the court concludes that a genuine issue of material fact exists as to Hicks' spoliation claim concerning the alteration of his privileges application.

### E. Tortious Interference with Contract

Hicks alleges that the Hospital tortiously interfered with his contractual relationship with BMG. Specifically, he claims that as a result of his deposition testimony and refusal to alter Hartman's medical file, the Hospital initiated a peer review proceeding against him in order to terminate his privileges and encouraged BMG to terminate his employment. The Hospital seeks summary judgment arguing that Hicks cannot establish all of the elements required for this claim.

A tortious interference action is based on the principle that "one who intentionally and improperly interferes with the performance of a contract between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract." *Kenty v. Transamerica Premium Ins. Co.,* 72 Ohio St.3d 415, 418–19, 650 N.E.2d 863, 867 (Ohio 1995). To prevail on a claim for tortious interference with contract, a plaintiff must demonstrate: (1) the existence of a contract; (2) the wrongdoer's knowledge of the contract; (3) the wrongdoer's intentional procurement of the breach; (4) lack of justification; and (5) resulting damages. *Id.*

The parties do not dispute that Hicks and BMG were parties to an employment contract and that the Hospital had knowledge of that contract. Under the third factor, the court has already concluded that a question of fact remains as to whether BMG breached the contract. Furthermore, for the same reasons as discussed below in relation to the fourth element, a reasonable jury could conclude that the Hospital intentionally sought to procure BMG's breach.

The Hospital contends that assuming it did intentionally procure a breach of Hicks' contract, it was justified in doing so. In *Fred Siegel Co. v. Arter & Hadden,* 85 Ohio St.3d 171, 176, 707 N.E.2d 853 (1999), the Ohio Supreme Court held that "establishment of the fourth element of the tort of tortious interference with contract, lack of justification, requires proof that the defendant's interference with another's contract was improper." In determining

whether an actor's interference with another's contract is improper, the court adopted the Restatements approach under § 767, which provides:

> In determining whether an actor's conduct in intentionally interfering with a contract ... is improper or not, consideration is given to the following factors:
> (a) the nature of the actor's conduct,
> (b) the actor's motive,
> (c) the interests of the other with which the actor's conduct interferes,
> (d) the interests sought to be advanced by the actor,
> (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,
> (f) the proximity or remoteness of the actor's conduct to the interference and
> (g) the relations between the parties.

85 Ohio St.3d at 178–79, 707 N.E.2d at 860.

The first factor, the nature of the actor's conduct, is the chief factor in determining whether the conduct is improper. *Super Sulky, Inc. v. U.S. Trotting Ass'n.,* 174 F.3d 733, 742 (6th Cir.1999). Wrongful means "will subject their users to liability even though [they] are free to accomplish the same result by more suitable means." *Id.* The Hospital argues that it was justified in its interference because it was responsible for ensuring that Hicks did not continue to perform surgery on patients once he admitted that he was not qualified to oversee the administration of anesthesia. While the Hospital may have been justified in concluding that it needed to ensure that qualified physicians oversaw administration of anesthesia during surgeries, the issue of whether an interference is improper "is not simply whether the actor is justified in causing the harm, but rather whether he is justified in causing it in the manner in which he does cause it." *Petrovski v. Federal Express Corp.,* 240 F.Supp.2d 685, 691 (N.D.Ohio 2002).

As to the second Restatement factor, the Hospital's motive, Hicks has presented sufficient evidence for a reasonable jury to conclude that the Hospital may have been motivated by his deposition testimony and refusal to alter Hartman's medical file rather than by its desire to ensure that Hicks did not continue to oversee the anesthesia he was not qualified to do. The third factor also weighs in Hicks favor, as he had a significant interest in his employment contract. The fourth factor weighs in the Hospital's favor because it had an interest in advancing its objective of ensuring patient safety regarding anesthesia. The sixth factor looks to the proximity of the conduct in causing the harm. *Super Sulky, Inc.,* 174 F.3d at 743. Here, a condition of Hicks' employment with BMG was that he maintain his Hospital privileges. Shortly after the events in Hartman, Hicks alleges that the Hospital conducted a peer review, which threatened to terminate his privileges. According to him, the peer review was initiated to interfere with his relationship with BMG. The seventh and final factor to be considered is the relationship between the parties. Under the circumstances, this factor is neutral as the relationship between the parties was arms-length. *Id.* Based on these factors, a reasonable jury could conclude that the Hospital improperly interfered with Hicks' employment contract and therefore its actions were not justified.

Finally, the Hospital argues that Hicks was not damaged as a result of the breach of his contract as required by the fifth element. Specifically, it contends that because Hicks believed that he was not qualified to oversee CRNAs during surgeries, that eventually either Hicks or BMG would have breached the employment agreement regardless of any actions the Hospital may have taken. The court does not find this argument persuasive as the record establishes that Hicks took some

steps to try to correct the problem concerning supervision of the CRNAs. Shortly after his deposition testimony in Hartman, Hicks claims that he made numerous requests to the BMG board and to the Hospital requesting that it hire a physician director of anaesthesia services as required by the Hospital's bylaws. He alleges that BMG informed him that it was pursuing hiring an anesthesiologist when in fact it never had any intention of doing so. Based on Hicks' requests and his belief that a physician director of anaesthesia services was going to be hired, the court cannot conclude that the only possible outcome was for either BMG or Hicks to breach the contract. Additionally, the court has already concluded that Hicks may be entitled to compensation for the work he performed in February 2000 as well as his car allowance for that month.

Based on the above analysis, the court finds that Hicks has presented sufficient evidence to create a genuine issue of material fact as to his tortious interference with contract claim. Accordingly, the Hospital's Motion for Summary Judgment is denied as to this claim.

### F.  Civil Conspiracy

Count V of Hicks' Complaint alleges that BMG and the Hospital conspired to terminate his employment in retaliation for his testimony in Hartman in violation of 42 U.S.C. § 1985 and Ohio law. As a preliminary matter, Hicks' § 1985 conspiracy claim must fail as a matter of law. Section 1985(2) provides:

[i]f two or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully and truthfully, . . . the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation,

against any one or more of the conspirators.

The phrase "court of the United States" in this section refers only to Article III courts and certain federal courts created by act of Congress, but not to state courts. *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1035 n. 2 (11th Cir.2000). Because Hicks civil conspiracy claim concerns his testimony in a state court action, his § 1985 claim fails as a matter of law.

Under Ohio law, a civil conspiracy consists of four elements: (1) a malicious combination; (2) two or more persons; (3) injury to person or property; and (4) existence of an unlawful act independent from the actual conspiracy. *Universal Coach, Inc. v. New York City Transit Auth., Inc.*, 90 Ohio App.3d 284, 292, 629 N.E.2d 28 (1993). The malice involved in the tort is "that state of mind under which a person does a wrongful act purposely, without a reasonable or lawful excuse, to the injury of another." *Id.* In general, "a plaintiff may not bring a claim for conspiracy unless he can also state a claim for the underlying cause of action." *Nilavar v. Mercy Health System Western Ohio*, 142 F.Supp.2d 859, 889 (S.D.Ohio 2000). Defendants' primary argument is that they are entitled to judgment as matter of law because Hicks cannot establish an underlying unlawful act. Hicks contends that there are four underlying unlawful acts to support his claim: (1) tortious interference with contract; (2) breach of contract; (3) wrongful discharge; and (4) violation of O.R.C. § 2921.03. The court will address each in turn.

### (1)

In *Wagoner v. Leach Co.*, 1999 WL 961166 (Ohio Ct.App.1999), the court held that while a cause of action exists for conspiracy to tortiously interfere with a contractual relationship, the claim "must

involve two or more non-parties [to the contract] conspiring to induce a party to breach his contract. It makes no sense to say that a party conspired to induce himself to breach a contract." *Id.* at *19. Thus, because Hicks' tortious interference claim involves a party to the contract and only one non-party, his civil conspiracy cannot rest on his tortious interference claim.

### (2)

■ As to breach of contract, BMG argues that Hicks is attempting to convert his breach of contract claim into a tort claim which is impermissible under Ohio law. The *Wagoner* court also addressed this issue and held that a party cannot be held liable for conspiring to breach his own contract. *Id.* at *20. The court reasoned that recognizing a claim for conspiracy to breach a contract permits a plaintiff to "restate as a conspiracy that which amounts to nothing more than breach of contract" allowing him "to metamorphose a contract claim into a tort, complete with the opportunity to seek punitive damages." *Id.* Accordingly, because BMG cannot be held liable for conspiring to breach the contract it follows that Hicks cannot show that two or more persons conspired to terminate his employment agreement.

### (3)

■ Next, Hicks contends that the Defendants efforts to wrongfully discharge him in retaliation for his actions in Hartman constitutes an underlying act for purposes of his civil conspiracy claim. Because the court has concluded that genuine issues of material fact exist as to Hicks' wrongful discharge claim, if a jury were to find in Hicks' favor on this claim, then it could serve as the underlying unlawful act to his civil conspiracy claim.

### (4)

Hicks' final argument is that the Defendants' actions violated O.R.C. § 2921.03(A), which provides:

No person, knowingly and by force, by unlawful threat of harm to any person or property, or by filing, recording, or otherwise using a materially false or fraudulent writing with malicious purpose, in bad faith, or in a wanton or reckless manner, shall attempt to influence, intimidate, or hinder a public servant, party official, or witness in the discharge of the person's duty.

This argument is without merit as there is no evidence in the record to suggest that Defendants used force or threat of harm to influence Hicks' testimony. Thus, § 2921.03(A) also cannot serve as the underlying act in the civil conspiracy claim.

Accordingly, Defendants' Motion for Summary Judgment as to civil conspiracy is denied.

## IV. CONCLUSION

For the foregoing reasons, CWHC's Motion for Summary Judgment (ECF No. 53) is granted with respect to Hicks' claim for wrongful discharge in violation of public policy against the Hospital but is denied as to the other claims Hicks has asserted against it. BMG's Motion for Summary Judgment (ECF No. 52) is granted with respect to Hicks' claim for breach of fiduciary duty but is denied as to the other claims Hicks has brought against it.

IT IS SO ORDERED.