**Susan T. FIGGINS, Plaintiff,**

v.

**ADVANCE AMERICA CASH ADVANCE CENTERS OF MICHIGAN, INC. and Advance America Cash Advance Centers, Inc., Defendants.**

No. 05–10235.

United States District Court, E.D. Michigan, Southern Division.

March 1, 2007.

Glen N. Lenhoff, Robert D. Kent–Bryant, Law Office of Glen N. Lenhoff, Flint, MI, for Plaintiff.

James R. Mulroy, II, Lewis Fisher, Memphis, TN, Andrew J. Paluda, Bigler, Berry, Troy, MI, for Defendants.

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

LAWSON, District Judge.

The plaintiff, Susan T. Figgins, worked as store manager for Advance America, a paycheck lending business, until she was fired following a medical leave taken because of her second pregnancy. The plaintiff has filed a five-count complaint alleging that the defendants were motivated to terminate her because she took FMLA leave, was pregnant, is overweight, and due to her age. The defendants moved for summary judgment, and the motion was argued before this Court on May 24, 2006. The Court now finds that the plaintiff has failed to offer evidence that creates a triable issue on her claim of age discrimination. There is evidence establishing a genuine factual dispute as to her other claims that preclude summary judgment. Therefore, the Court will grant in part and deny in part the defendants' motion for summary judgment.

### I.

The defendants are in the business of making short-term loans to consumers that are intended to be repaid from the proceeds of the borrower's anticipated next paycheck. They have over 2,600 offices nationwide and several in Michigan.

Plaintiff Figgins was hired as the manager of the defendants' Lapeer, Michigan office on October 22, 2001. At that time, the plaintiff was 36 years old. She was 39 years old when her employment ended. She is five feet, four inches tall and weighed 218 pounds at the time the motion papers were submitted. She weighed 210 pounds during most of her employment, except when she was pregnant, when she weighed more. The defendants acknowledge that the plaintiff is overweight according to government guidelines.

As a result of her second pregnancy, Ms. Figgins reduced her work hours on her doctor's advice in April 2004, took a full-time leave of absence on August 9, 2004, gave birth on September 10, 2004, and was cleared by her doctor to return to work in November 2004. She says that during her pregnancy and before, a supervisor berated her because of her weight and criticized her for getting pregnant "at her age"; management erroneously told her she was not entitled to leave under the Family and Medical Leave Act; and the defendants wrongfully terminated her employment on November 8, 2004. The defendants maintain that no one discriminated against the plaintiff due to her weight, and they contend that they employ lots of overweight people. In fact, the defendants furnished a photo gallery of many of its employees, depicting people of all shapes and sizes. They also contend that the plaintiff cannot show that she was replaced by someone younger than she or that her second pregnancy played any role in her termination. Finally, they state that the plaintiff cannot show that she was fit to return to work before her FMLA leave expired, so she cannot maintain an interference or retaliation claim under that statute.

The defendants' chain of command is not altogether clear, but based on the motion papers it appears that each loan store is run by a manager, who is assisted by an assistant manager. A group of stores is supervised by an area manager, who is supervised by a district director of operations; above that position is the regional director of operations.

Pamela Hazen was the plaintiff's area manager. The plaintiff testified that she and Ms. Hazen are "maybe the same" size. Defs.' Mot. Summ. J. Ex. 1, Figgins Dep. at 104. Dennis Fischer is the regional director of operations. As a male, he is larger than the plaintiff and appears to be overweight. Donna Brewer was the plaintiff's assistant manager. Ms. Brewer weighs 180 pounds and is five feet, three inches tall.

The plaintiff had two pregnancies during her employment with the defendants, the first occurring in 2003. Beginning March 24, 2003, the plaintiff took 10 weeks of FMLA leave due to pregnancy. Both pregnancies were complicated by gestational diabetes. Prior to taking leave for the first pregnancy, the plaintiff took insulin shots and dieted to control the diabetes. She tested her blood at her desk and talked about her pregnancy and medical issues with her coworkers. During the plaintiff's absence at the time of the first pregnancy, Donna Brewer, the assistant manager, ran the Lapeer store. The plaintiff returned from FMLA leave on June 2, 2003, and she was returned to work as the store manager.

Prior to the plaintiff's first pregnancy, the plaintiff's divisional director of operations (DDO) was David Crispin. When she returned from maternity leave, Deborah LaBeff had become the DDO. Ms. LaBeff, who, the plaintiff claims, was the main source of all her employment troubles, was 42 years old at the time of the plaintiff's termination. However, the plaintiff's last performance evaluation was written by Ms. LaBeff right when the plaintiff returned from her first pregnancy leave, and it appears to be quite positive. Parts of the evaluation are difficult or impossible to read, but the plaintiff claims it contains the following statements:

- Produces thorough, accurate and consistent work product.

- Conscientious. Consistently on the job working effectively.
- Consistently works to foster positive relationships with customers and co-workers.
- A positive factor in team morale. Accepted, respected, cooperative and relates well to others.
- Very dependable employee.

Pl.'s Resp. Br. at 2; *see also* Pl.'s Resp. Ex. 4, Performance Evaluation.

After that evaluation, the plaintiff states that an incident occurred which soured the relationship between LaBeff and her. When Ms. LaBeff first became the DDO, she told the plaintiff to write the client's pay frequency (i.e., weekly, biweekly) on the client's file next to the client's name. Prior to this instruction, it had been the plaintiff's understanding that nothing was to be written on the file other than the client's name. The plaintiff asked Ms. LaBeff when the policy was changed, and LaBeff replied that a memo had been sent out. The plaintiff never received such a memo. Later, at a regional meeting, the plaintiff asked Nicole Tucker, whose job title is not stated, if she was supposed to be writing the pay frequency on the files. Ms. Tucker, "in front of all the managers," told the plaintiff not to write on the folders. Defs.' Mot. Summ. J. Ex. 1, Figgins Dep. at 74. The plaintiff stated Ms. LaBeff' s face turned "beet red" and "that [Ms. LaBeff] didn't really care too much for [the plaintiff] after that." *Ibid.*

The plaintiff stated LaBeff attempted to undermine her authority by making her look bad in front of her assistant manager and by ridiculing and teasing her. The plaintiff stated Ms. LaBeff called her "bonehead" and made a big deal out of errors she made. Defs.' Mot. Summ. J. Ex. 1, Figgins Dep. at 77. The plaintiff stated Ms. LaBeff picked on her and made her "feel small." *Ibid.* The plaintiff feared

Ms. LaBeff would terminate her "because of the threatening and intimidating" that she experienced. *Id.* at 147. The plaintiff failed to describe any specific instances of ridiculing, but when asked to characterize comments LaBeff made about her weight and health habits during her second pregnancy, recounted below, the plaintiff stated they were "criticizing," "ridiculing," and "aggressive." *Id.* at 83–84.

The plaintiff testified that Ms. LaBeff made comments about her weight from the beginning of her employment, even prior to her second pregnancy. Erica Starkey, a former area manager, stated in an affidavit that LaBeff made comments to her about the plaintiff's eating habits. In July 2003, LaBeff allegedly told Starkey that the plaintiff and her assistant manager, Ms. Brewer, "looked like [ ] they just walked out of a trailer." Pl.'s Resp. Ex. 5, Starkey Aff. at ¶ 15. In July or August 2003, Ms. Starkey reports that the plaintiff was getting a soda to drink, and Ms. La-Beff stated, "Did you make sure that you got diet pop?" *Id.* at ¶ 11. Ms. Starkey reports that Ms. LaBeff, at a Chinese restaurant in November 2003, stated, "Didn't she have enough to eat?" about the plaintiff. *Id.* at ¶ 10.

The plaintiff's second pregnancy began in January 2004. The plaintiff stated Ms. LaBeff seemed unhappy about the pregnancy and commented, "at your age you're pregnant. Don't you know what causes that … With your weight and your age being pregnant, you're going to end up being off work all the time." Defs.' Mot. Summ. J. Ex. 1, Figgins Dep. at 77. The plaintiff stated Ms. LaBeff often commented that the pregnancy would cause excessive absences and told the plaintiff, "you should watch what you're eating" at least twelve times. Pl.'s Resp. Ex. 9, Figgins Dep. at 172. The plaintiff stated that LaBeff gave her unsolicited advice regarding her diet, advising her to drink less

soda, eat less candy, eat more salads, eat fewer fattening foods, and drink more water. Defs.' Mot. Summ. J. Ex. 1, Figgins Dep. at 84. At a managers meeting, where candy is usually available, Ms. La-Beff told the managers, "we can't have candies on the table because of Sue [the plaintiff]." *Ibid.*

The plaintiff said that LaBeff continued to make comments to Ms. Starkey about the plaintiff's weight, age, and the problems her pregnancy would cause. In January or February 2004, the plaintiff, La-Beff, and Starkey had dinner at a Red Lobster restaurant. Ms. Starkey reports in her affidavit that Ms. LaBeff made comments about Ms. Figgins' meal. In March or April 2004, Ms. LaBeff complained to Ms. Starkey that the plaintiff's latest pregnancy was inconvenient because it would require the plaintiff to be out of the office. Ms. LaBeff reportedly stated, "What is she thinking about having a baby at her age?" Pl.'s Resp. Ex. 5, Starkey Aff. at ¶ 16. Starkey also states that LaBeff "showed an unusual interest in Ms. Figgins' dietary habits." *Id.* at ¶ 12. LaBeff also commented on Starkey's weight and choice of clothing, stating in 2002, that "it looked like [Starkey] was putting on weight" and telling her that the clothes she was wearing "were not appealing on someone" her size. *Id.* at ¶¶ 13–14.

At some point during this pregnancy, the plaintiff and her assistant manager, Donna Brewer, allegedly opened the store late after the 10:00 a.m. start time. Ms. Brewer and Ms. LaBeff both testified at their depositions that on one occasion, the store did not open until about 10:30 a.m. because the plaintiff and Ms. Brewer were sitting at the front counter with the store lights out eating food from a McDonalds restaurant instead of opening the store. The plaintiff denies that this occurred.

Ms. Brewer testified that she and the plaintiff took four cigarette breaks each day even though they were only entitled to two breaks. On one occasion, Ms. LaBeff arrived at the plaintiff's store and saw the plaintiff standing outside smoking and talking on her cell phone. Ms. LaBeff sat in her car and watched the plaintiff smoking and talking for twenty minutes. When the plaintiff went back in the store, Ms. LaBeff stayed in her car and watched the store. About thirty minutes later, the plaintiff came back out and started smoking and talking on her cell phone again. Ms. LaBeff stated she had given the plaintiff permission to take extra breaks as needed to deal with the medical issues associated with her pregnancy, but not to smoke and talk on the phone. The plaintiff denies taking four breaks per day.

The plaintiff's job required her to perform marketing tasks in the community, such as putting flyers on cars or dropping off pens at apartment complexes. Ms. LaBeff says she checked several times to confirm whether the plaintiff had actually done what she claimed, and she claims that the plaintiff lied about doing the marketing. LaBeff also testified that the plaintiff violated the dress code several times, accusing the plaintiff of keeping clothes that conformed with the dress code at the store to change into when Ms. LaBeff came to the store. The plaintiff denies this as well. However, audits that were performed on the plaintiff's store in June and July 2004 suggest above-average performance. The store scored 329 out of 334 points on the June 2004 audit (98.5%); and scored 439 points out of 449 points in July 2004 (97.7%).

During her second pregnancy, the plaintiff's doctor advised her to work only 32 hours per week beginning April 2, 2004. The plaintiff's request to take eight hours of FMLA leave per week was approved, and that day the plaintiff began working 32 hours per week. The plaintiff stated she used 132.36 hours of FMLA leave from April 1, 2004 to August 9, 2004.

On August 9, 2004, the plaintiff went on full time leave again for pregnancy. The plaintiff stated she had only used 132.36 hours of FMLA leave in the prior year, August 9, 2003 to August 9, 2004, leaving her with 347.67 hours (slightly less than 9 weeks) of FMLA leave available. The plaintiff stated in her leave request that she expected to return to work some time in October. A few days later, the plaintiff received a letter from Miranda Rogers, the defendants' benefits coordinator, stating that she was not eligible for FMLA leave:

Dear Ms. Figgins:

On August 11, 2004 we were notified of your need to take a leave of absence due to: a serious health condition, that makes you unable to perform the essential functions of your job,

Your leave began on August 9, 2004.

This letter is to inform you that:

1. You are not eligible for a Family Medical Leave of Absence (FMLA), however you do qualify for a medical leave. Please understand that while on a medical leave your position is not guaranteed.

2. The leave you requested will be counted against your Medical Leave entitlement as stated in the Employee Handbook section of the People Manual.*

3. You are required to furnish medical certification (enclosed form) of your health condition. You must furnish this certification no later than August 24, 2004, or you will be subject to the attendance policy and terminated for excessive absences. Please return the certification, to me, in the enclosed envelope.

4. You are required to use all of your accrued, unused paid time off (vacation, sick and floating holidays) at the beginning of your leave. You will not be paid for any holidays that occur during your leave.

5. If you normally pay premiums for your medical, dental or other benefits, these payments will continue during your leave. You will receive a separate letter from the Benefits Department, which explains any premium payment obligations. If payment is not received in a timely manner, your benefits will be cancelled. **The Company will not pay your share of the premiums for health insurance or any other benefits (e.g., dental, voluntary life) you have through the company while you are on leave.**

6. You will be required to present a fitness for duty certificate (e.g., doctor's release to full duty) prior to returning to work. If this certification is not received, your return to work will be delayed until the certification is provided.

7. While on leave, you are required to furnish the company with periodic reports. *Every week you* **must** *notify your supervisor of your status and intent to return to work.* If the circumstances of your leave change and you are able to return to work earlier than your expected return date, notify your supervisor as soon as practical.

8. If your leave continues for more than 45 days you will be required to provide additional health care provider certification. If your leave continues beyond 90 days then you will be required to submit another health care provider certification.

9. During your leave, should you request an extension of your leave, you will be required to provide additional health care provider certification.

10. Our Outside Employment Policy still applies during your Medical Leave.

11. Please notify your payroll associate of any address or telephone changes you may have while you are on leave.

* For Team Members not eligible for FMLA Leave Advance America may grant an employee up to a maximum of twenty-six (26) weeks of unpaid medical leave in any 12–month period including any FMLA qualifying leave taken during that same period. If you return from this leave within thirty (30) days and do not go out for the same or similar condition for at least thirty (30) days after you return, you may be returned to your former position or to a similar position depending on operational needs and your ability to perform. If your medical leave continues beyond thirty (30) days, you may be returned to your former position or a similar one, if available, when you return from leave. However, operational needs may override Advance America's ability to hold your position until you return from your leave. Therefore, Advance America cannot ensure that it will be able to return you to any position after the conclusion of your medical leave. If you refuse to return after your medical leave expires or if you refuse to provide requested documentation or to cooperate with Advance America, this may be considered a resignation and could result in your termination.

Pl.'s Resp. Ex. 11, Letter from Rogers. The plaintiff states Ms. Rogers miscalculated her available FMLA leave time because she counted the leave the plaintiff had taken through June 2, 2003. However, the plaintiff believes that since this leave was taken more than one year prior to August 2004, it could not be counted. The defendants claim the plaintiff failed to count the intermittent leave she took be-

ginning in April 2004, which caused her FMLA leave to expire "at the latest, on September 25, 2004." Defs.' Mot. Summ. J. at 6.

After receiving this letter, the plaintiff says she contacted the Department of Labor and did research on the Internet because she believed Ms. Rogers was wrong about her eligibility for FMLA leave. What the plaintiff learned about the FMLA confirmed to her that Ms. Rogers miscalculated the amount of leave she was entitled to take. However, the plaintiff did not contact any of the defendants' representatives to dispute the decision that she was not entitled to FMLA leave.

The plaintiff testified that she called her supervisor weekly during her leave, as instructed by Ms. Rogers' letter. During one of these calls in August 2004, Ms. LaBeff informed the plaintiff that her position at the Lapeer store had been filled because "Corporate insisted that we don't leave a Branch open." Pl.'s Resp. Ex. 9, Figgins Dep. at 95. The plaintiff's position was filled by Shannon Wolschlager on August 16, 2004. Ms. Wolschlager is a slender woman who was 22 years old at the time. The plaintiff did not understand why her position had to be filled since her assistant manager, Ms. Brewer, had filled in for her during her previous pregnancy leave. Ms. LaBeff could not provide an explanation for this change, and she suggested that perhaps the plaintiff could work as a floating manager when she returned. The plaintiff stated a floating manager position is "clear and simple a demotion" from her store manager position. Pl.'s Resp. Ex. 9, Figgins Dep. at 96. The record shows that floating managers receive less pay and fewer benefits and are not entitled to receive bonuses.

After learning about being replaced, the plaintiff continued to call the store every week to ask Ms. LaBeff about available positions. The plaintiff testified that during these calls Ms. LaBeff frequently made comments about the plaintiff's weight and always told her that no positions were available. However, the plaintiff stated that four manager positions at other stores in the area became available during her leave of absence. Margaret Burt, who worked at a Flint location, was terminated on September 16, 2004. In addition, Ms. Wolschlager, who had replaced the plaintiff at the Lapeer store, resigned on September 11, 2004. The plaintiff states none of these positions were offered to her. In October 2004, Ms. Wolschlager was replaced by Christine MacKenzie, who is five feet, three inches tall and weighs 176 pounds.

Although the plaintiff originally expected to return to work in October, her doctor did not release her to return to work until November. She testified, however, that her doctor would have released her to return to work in October had there been a position available. The plaintiff eventually submitted a note from her doctor indicating she could return to work on November 6, 2004. The plaintiff stated she contacted Ms. LaBeff and asked to be returned to work. The plaintiff stated Ms. LaBeff told her nothing was available and terminated her. LaBeff filled out a Termination Form, writing, "Sue was on medical leave. Upon release from her doctor there was not an open position for her. Job eliminated." Pl.'s Resp. Ex. 17, Termination Form. The form required Ms. LaBeff to check "yes" or "no" as to whether the plaintiff was qualified to be rehired. Ms. LaBeff checked "no." *Ibid.*

In her deposition, Ms. LaBeff inexplicably claims that the plaintiff had the opportunity to return to work at the Lapeer store, and she was terminated only when she failed to report to work after being released by her doctor. LaBeff stated that a few weeks later she offered the

plaintiff an assistant manager position at a store in Clio at her former rate of pay, but the plaintiff refused to take the job. Ms. LaBeff was asked why she did not record any of this information on the Termination Form she completed, which instead indicates that the plaintiff was terminated because no position was available. She replied, "I guess I'm just not wordy." Pl.'s Resp. Ex. 2, LaBeff Dep. at 144. The plaintiff submitted an affidavit swearing that Ms. LaBeff's testimony is not true. Pl.'s Resp. Ex. 1, Figgins Aff. at ¶ 16.

On December 6, 2004, the plaintiff wrote a lengthy email message to Dennis Fischer, a regional director, asking to be rehired by the defendants. She recounted several incidents in which Deborah LaBeff acted deceitfully and manipulatively, and she acknowledged that she was not certain of LaBeff' s motivation, although she speculated that LaBeff "has a personal vendetta against me, or if it is that I make too much money and she can hire someone for less or maybe the company doesn't want me back because I've had two babies and used too much insurance money." Defs.' Mot. Summ. J. Ex. 11, Email to Dennis Fischer. The record does not disclose a response to this overture.

The defendants point out that in 2004 and 2005, Ms. LaBeff hired nine people within five years of the plaintiff's age, six of whom are older than the plaintiff. LaBeff also promoted at least five people near the plaintiff's age to branch manager or area manager positions during that time period. Pictures of several of these people are included in the defendants' photo gallery, mentioned earlier.

The plaintiff filed a complaint with the EEOC and received Right to Sue letters for both Advance America Cash Advance Centers, Inc. and Advance America Cash Advance Centers of Michigan, Inc. She filed her complaint in this Court on September 7, 2005. The summary judgment motion was filed after the conclusion of discovery.

## II.

A motion for summary judgment under Federal Rule of Civil Procedure 56 presumes the absence of a genuine issue of material fact for trial. The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (internal quotes omitted).

A fact is "material" if its resolution affects the outcome of the lawsuit. *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir.2001). "Materiality" is determined by the substantive law claim. *Boyd v. Baeppler*, 215 F.3d 594, 599 (6th Cir.2000). An issue is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Henson v. Nat'l Aeronautics & Space Admin.*, 14 F.3d 1143, 1148 (6th Cir.1994) (quoting *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505). Irrelevant or unnecessary factual disputes do not create genuine issues of material fact. *St. Francis Health Care Ctr. v. Shalala*, 205 F.3d 937, 943 (6th Cir.2000). When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact. *Matsushita Elec. Indus. Co. v.*

*Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Thus a factual dispute that "is merely colorable or is not significantly probative" will not defeat a motion for summary judgment that is properly supported. *Kraft v. United States*, 991 F.2d 292, 296 (6th Cir.1993); *see also Int'l Union, United Auto., Aerospace and Agric. Implement Workers of Am. v. BVR Liquidating, Inc.*, 190 F.3d 768, 772 (6th Cir.1999).

The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Mt. Lebanon Pers. Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir.2002). The party opposing the motion then may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir.1989). A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. If the non-moving party, after sufficient opportunity for discovery, is unable to meet his or her burden of proof, summary judgment is clearly proper. *Celotex Corp.*, 477 U.S. at 322–23, 106 S.Ct. 2548.

The party who bears the burden of proof must present a jury question as to each element of the claim. *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir.2000). Failure to prove an essential element of a claim renders all other facts immaterial for summary judgment purposes. *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 895 (6th Cir.1991). It must be emphasized, however, that "[i]n evaluating the evidence, [the court] 'draw[s] all reasonable inferences therefrom in a light most favorable to the non-moving party.'" *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir.2003).

The Court has supplemental jurisdiction over the plaintiff's state law claims. *See* 28 U.S.C. § 1367(a) (stating that "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution"); *see also Harper v. AutoAlliance Int'l, Inc.*, 392 F.3d 195, 209 (6th Cir.2004). "A federal court exercising supplemental jurisdiction over state law claims is bound to apply the law of the forum state to the same extent as if it were exercising its diversity jurisdiction." *Super Sulky, Inc. v. U.S. Trotting Ass'n*, 174 F.3d 733, 741 (6th Cir. 1999). In such cases, the Court must apply the law of the forum state's highest court. *Erie R.R. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). If the state's highest court has not decided an issue, then "the federal court must ascertain the state law from 'all relevant data.'" *Garden City Osteopathic Hosp. v. HBE Corp.*, 55 F.3d 1126, 1130 (6th Cir. 1995) (quoting *Bailey v. V. & O Press Co.*, 770 F.2d 601, 604 (6th Cir.1985)). "Relevant data includes the state's intermediate appellate court decisions, as well as the state supreme court's relevant *dicta*, restatements of the law, law review commentaries, and the majority rule among other states." *Ososki v. St. Paul Surplus Lines*, 156 F.Supp.2d 669, 674 (E.D.Mich.2001) (internal quotes and citation omitted) (citing *Angelotta v. Am. Broad. Corp.*, 820 F.2d 806, 807 (6th Cir.1987)).

### A.

Noting that the plaintiff was an at-will employee, a point that is not in contention, the defendants focus first on the plaintiff's weight discrimination claim. That count is brought under state law, found in the Michigan Elliott–Larsen Civil Rights Act, Mich. Comp. Laws § 37.2101, *et seq.* The Elliott–Larsen Civil Right Act provides a cause of action for discrimination based on weight. The Act states in relevant part:

(1) An employer shall not do any of the following:

(a) Fail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of ... weight.

Mich. Comp. Laws § 37.2202. "[Weight] does not have to be the only reason, or even the main reason, but it does have to be one of the reasons which made a difference in determining whether or not to [discharge] the plaintiff." *Matras v. Amoco Oil Co.,* 424 Mich. 675, 682, 385 N.W.2d 586, 589 (1986) (quoting Michigan Standard Jury Instructions).

Michigan law tracks federal employment discrimination analysis. *See Lamoria v. Health Care & Retirement Corp.,* 230 Mich.App. 801, 806–07, 584 N.W.2d 589 (1998), *vacated then reinstated by* 233 Mich.App. 560, 593 N.W.2d 699 (1999). As in federal employment discrimination cases, a plaintiff may establish discriminatory animus in a claim of weight discrimination under two theories: direct evidence or circumstantial evidence. Direct evidence is that evidence that, if believed, "requires the conclusion that unlawful discrimination was at least a motivating factor" in the employer's actions. *Id.* at 807, 584 N.W.2d 589, 584 N.W.2d at 593 (internal quote marks omitted); *see also Amini v. Oberlin College,* 440 F.3d 350, 359 (6th Cir.2006). Michigan courts have held that

discriminatory "slurs by a decisionmaker constitute direct evidence of ... discrimination that is sufficient to get the plaintiff's case to a jury." *Lamoria,* 230 Mich. App. at 807, 584 N.W.2d at 593 (internal quote marks omitted); *see also Downey v. Charlevoix County Bd. of Road Comm'rs,* 227 Mich.App. 621, 576 N.W.2d 712 (1998). The Sixth Circuit has also held that discriminatory slurs constitute direct evidence. *Talley v. Bravo Pitino Rest., Ltd.,* 61 F.3d 1241, 1249 (6th Cir.1995) (holding that "plaintiff presented evidence that both Mr. DiRaimo and Mr. Pitino had made racist comments which constitute direct evidence that plaintiff's termination may have been racially motivated"). Even one comment by a decision-maker can support a direct evidence case. "[A]lthough direct evidence generally cannot be based on isolated and ambiguous remarks ... when made by an individual with decision-making authority, such remarks become relevant in determining whether there is enough evidence to establish discrimination." *DiCarlo v. Potter,* 358 F.3d 408, 416 (6th Cir.2004) (finding decision-maker's comment about "dirty wops" constituted direct evidence of discrimination) (citation omitted).

The defendants contend that the plaintiff cannot prove weight discrimination by direct evidence because the several comments by Deborah LaBeff amounted only to expressions of personal concern about the plaintiff's health and advice about her diet. Also, the remarks ended in August 2004 and the termination took place in November, so the defendants reason that the remarks were remote even if they are found to be evidence of a predisposition against overweight people. Finally as to this count, the defendants argue that the plaintiff cannot make out a circumstantial case of weight discrimination because the plaintiff was not fit to return to work until November 2004, at which time her more

slender replacement was herself replaced by a heavy individual. The plaintiff disputes each of these contentions.

In *Lamoria v. Health Care & Retirement Corp.*, the Michigan Court of Appeals found direct evidence of weight-based discrimination where a supervisor made critical comments about the plaintiff's weight. The court made a point to observe that such comments must be viewed in context, since being overweight, unlike race, was a health-related condition. "Accordingly, comments that could be reasonably taken as mere advice about diets and the like do not amount to expressions of animus sufficient to indicate a likelihood that one would engage in illegal weight discrimination." *Lamoria*, 230 Mich.App. at 810 n. 8, 584 N.W.2d at 595 n. 8. However, in that case, the supervisor's comments were more critical than advisory:

> Lamoria has produced direct evidence that Martin expressed hostile views toward "overweight" employees at Sun Valley, including Lamoria herself. LaVigne stated in her affidavit that Martin made disparaging comments about "heavy people," including Sun Valley employees. Further, Hall stated in her affidavit that Martin and Livy "made critical and harsh remarks in [Hall's] presence about the weight of some Sun Valley Manor personnel, including Annette Smith and Barbara Lamoria, in a manner that suggested to [Hall] that they intended to terminate people who they perceived as overweight." This evidence of hostile remarks by a supervisory or managerial level employee based on weight is similar to the racial slurs discussed in *Harrison, supra*, and may be evidence of animus based on a characteristic upon which discrimination is forbidden by the state Civil Rights Act. Further, LaVigne stated that "Annette Smith, Donna Hair and Barbara Lamoria were all over-weight by Martin's standards, and all were fired or forced

to resign while Martin was Administrator." From this evidence, a reasonable factfinder might infer that Lamoria's weight was a decisive factor in defendants' decision to discharge Lamoria. Accordingly, Lamoria presented enough direct evidence to support a conclusion that she was discharged on the basis of her weight. The trial court erred in granting defendants' motion for summary disposition with respect to Lamoria's claim of weight discrimination in violation of the state Civil Rights Act. *Id.* at 809–10, 584 N.W.2d at 595.

Similarly, in this case the plaintiff has presented direct evidence of weight-based animus on the part of Deborah LeBeff, the plaintiff's supervisor. Perhaps a fact finder might conclude that LaBeff's multiple comments were nothing more that benign expressions of concern about the plaintiff's health, but the evidence viewed in the light most favorable to the plaintiff does not support that conclusion. The plaintiff has presented affidavits and deposition testimony that Ms. LaBeff, the decision-maker who terminated her, made repeated critical remarks about her weight beginning in July 2003, just after the plaintiff returned from her first maternity leave, and continuing through the plaintiff's second maternity leave. Erica Starkey, a former area manager, submitted an affidavit stating that Ms. LaBeff made repeated comments about the plaintiff's eating habits, such as, "Did you make sure that you got diet pop?" Pl.'s Resp. Ex. 5, Starkey Aff. at ¶ 11, and "Didn't she have enough to eat?" *Id.* at ¶ 10. Ms. Starkey states that Ms. LaBeff "showed an unusual interest in Ms. Figgins' dietary habits." *Id.* at ¶ 12. The plaintiff testified at her deposition that Ms. LaBeff told her, "you should watch what you're eating" at least twelve times. Pl.'s Resp. Ex. 9, Figgins Dep. at 172. The plaintiff states Ms. LaBeff gave her unsolicited advice regarding her diet, advising

her to drink less soda, eat less candy, eat more salads, eat fewer fattening foods, and drink more water. Defs.' Mot. Summ. J. Ex. 1, Figgins Dep. at 84. At a managers' meeting, where candy is usually available, Ms. LaBeff told the managers, "we can't have candies on the table because of Sue." *Ibid.* The plaintiff characterized these comments as "criticizing," "ridiculing," and "aggressive." *Id.* at 83–84.

■ Ms. LaBeff also commented on Erica Starkey's weight and choice of clothing. In 2002, Ms. LaBeff told Ms. Starkey that "it looked like [she] was putting on weight" and told her that the clothes she was wearing "were not appealing on someone" her size. Pl.'s Resp. Ex. 5, Starkey Aff. at ¶¶ 13–14. The plaintiff also testified that she called the store every week during her second pregnancy leave, and she claims Ms. LaBeff continued to make comments about her weight during these conversations. Pl.'s Resp. Ex. 9, Figgins Dep. at 98, 173. These are not stray remarks, but repeated comments by the decision-maker over a period of at least a year, right up to the plaintiff's termination. In *Lamoria,* the Michigan Court of Appeals found that "disparaging comments about 'heavy people'" and " 'critical and harsh remarks ... about the weight of some'" employees constituted direct evidence of weight discrimination. *Lamoria,* 230 Mich.App. at 809, 584 N.W.2d at 595. While Ms. LaBeff may deny making such remarks, that is a fact issue for a jury to decide.

The claim that the comments are remote is not supported by the record. To say that the plaintiff was not terminated until November 2004 is perhaps technically correct. However, the plaintiff left the workplace in August 2004 on maternity leave, so Ms. LaBeff did not have the opportunity to criticize her further face to face after that date. LaBeff filled the plaintiff's position shortly thereafter. Moreover, although she was not on the job, the plaintiff

testified that the comments continued while on leave when the plaintiff called weekly to report on her status.

The Court finds that the record contains direct evidence of weight-based animus harbored by the plaintiff's supervisor that allows a reasonable person to conclude that LaBeff caused the plaintiff to be terminated, failed to rehire her, and marked her severance papers as ineligible for re-hire due to an illegal motive. Summary judgment, therefore, may not be granted on that claim, and the Court need not consider whether the plaintiff can make out a case based on circumstantial evidence. *See Lamoria,* 230 Mich.App. at 807, 584 N.W.2d at 593 (holding that "where a plaintiff presents direct evidence of discriminatory animus, it is erroneous for a trial court to use the *McDonnell Douglas* framework").

### B.

The defendants next contend that the plaintiff has not offered either direct or circumstantial evidence of age discrimination in violation of Michigan law. The plaintiff counters with the following comments by Ms. LaBeff as constituting direct evidence of age discrimination: "What is she thinking about having a baby at her age?" Pl.'s Resp. Ex 5, Starkey Aff. at ¶ 16; "At your age you're pregnant. Don't you know what causes that?" *Id.* Ex. 9, Figgins Dep. at 77; "With your weight and your age being pregnant, you're going to end up being off work all the time." Pl.'s Resp. Ex. 9, Figgins Dep. at 77.

The plaintiff also claims she can make out a prima facie circumstantial case of age discrimination because she was in a protected class at the age of 39, she was qualified for the job, she was terminated, and she was replaced by Shannon Wolschlager, who was 22 years old at the time,

or Christine MacKenzie, who was 27 years old.

■ The Court believes that the defendants have the better argument on this count. To make out a claim of age discrimination under the Elliott–Larsen statute, a plaintiff must produce evidence that she suffered an adverse employment action and that age was a determining factor in the employer's decision. *Town v. Mich. Bell Tel. Co.*, 455 Mich. 688, 697, 568 N.W.2d 64, 69 (1997). The comments by Ms. LaBeff about the plaintiff's age do not qualify as direct evidence of age discrimination. Ms. LaBeff expressed surprise that the plaintiff would want to have a baby at the age of 39. These comments are not critical of the plaintiff for being old in relation to the workplace; they may express criticism of the plaintiff's decision to have a baby at her age, but it is not direct evidence that the plaintiff was terminated from her job because of her age. Too great an inference would be required to make that conclusion. Such comments do not "require[ ] the conclusion that unlawful discrimination was at least a motivating factor," *Amini*, 440 F.3d at 359.

■ Nor has the plaintiff made out the *prima facie* elements of a circumstantial age discrimination case. To prove a *prima facie* case, the plaintiff must show she is a member of a protected class, she was qualified for the job, she suffered an adverse employment action, and she was replaced by a person outside the protected class. *Hein v. All America Plywood Co., Inc.*, 232 F.3d 482, 489 (6th Cir.2000); *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir.1992); *Town v. Mich. Bell Tel. Co.*, 455 Mich. 688, 695, 568 N.W.2d 64, 68 (1997). Although Deborah LaBeff filled the plaintiff's position with 22–year–old Shannon Wolschlager, the plaintiff was out on leave at that time because she could not yet return to work. Therefore, the plaintiff was not qualified for the job at the time this decision was made. "An employee is qualified if he was performing his job at a level that met the employer's legitimate expectations." *Town*, 455 Mich. at 699, 568 N.W.2d at 69. The plaintiff could not perform the job at that time and therefore cannot make out a prima facie case.

■ The plaintiff also claims that the defendants failed to return her to a position after she was released by her doctor. Although the plaintiff has presented evidence that positions were available, the plaintiff has not submitted any evidence that those positions were filled by persons outside the protected class. Therefore, the plaintiff cannot make out a *prima facie* circumstantial case of age discrimination. That count will be dismissed.

## C.

Next, the defendants argue that the plaintiff cannot prove gender or pregnancy discrimination because she was not pregnant at the time of her termination. They also repeat their argument that Ms. La-Beff's comments about the plaintiff being pregnant were motivated by her concern for the plaintiff's health. The plaintiff responds that she does not have to be pregnant at the time of the termination to make out a pregnancy discrimination claim. The plaintiff states the fact that she had been pregnant is sufficient, as long as there is proof that the employer knew the plaintiff was pregnant. Both sides cite *Prebilich–Holland v. Gaylord Entertainment Co.*, 297 F.3d 438 (6th Cir.2002), in support of their arguments.

The Pregnancy Discrimination Act (PDA) amended Title VII of the Civil Rights Act of 1964 to add to the definitional terms "because of sex" and "on the basis of sex" the idea that employment discrimination cannot result from "pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, child-

birth, or related medical conditions." 42 U.S.C. § 2000e(k). Just like other discrimination claims, claims under the PDA may proceed based on direct or circumstantial evidence:

[A] plaintiff states a PDA claim if she offers direct evidence that, in treating a plaintiff adversely, the defendant was motivated by discriminatory animus. See Ensley–Gaines v. Runyon, 100 F.3d 1220, 1224 (6th Cir.1996). Even direct evidence of discrimination is irrelevant, however, unless the alleged discrimination is because of sex. See Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) ("Whatever evidentiary route the plaintiff chooses to follow, he or she must always prove that the conduct was not merely tinged with offensive sexual connotations, but actually constituted 'discrimina[tion] . . . because of . . . sex.' ") (emphasis and alteration in original). Discrimination "because of sex," under the PDA, must be "because of or on the basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k).

Kocak v. Cmty Health Partners of Ohio, Inc., 400 F.3d 466, 469 (6th Cir.2005).

■ The Sixth Circuit previously outlined the elements of a circumstantial pregnancy discrimination case as follows: "To establish a prima facie case of pregnancy discrimination, the plaintiff must show that '(1) she was pregnant, (2) she was qualified for her job, (3) she was subjected to an adverse employment decision, and (4) there is a nexus between her pregnancy and the adverse employment decision.' " Prebilich–Holland, 297 F.3d at 442. However, in Kocak v. Community Health Partners of Ohio, Inc., the court made it clear that the first element does not require actual pregnancy: "Whether one is or is not pregnant at the time does not control whether one can allege discrimina-

tion under the Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k)." Kocak, 400 F.3d at 468. "The Supreme Court has held that the PDA prohibits an employer from discriminating against a woman 'because of her capacity to become pregnant.' " Id. at 469. The fourth prong requires knowledge by the defendant that the plaintiff was pregnant or had the capacity to become pregnant. "[I]n order to establish the fourth prong of a prima facie case of pregnancy discrimination, that is, that there is a nexus between the employee's pregnancy and the adverse employment action, the employee bears the burden of demonstrating that the employer had actual knowledge of her pregnancy [or capacity to become pregnant] at the time that the adverse employment action was taken." Prebilich–Holland, 297 F.3d at 444. Michigan law tracks this analysis as well. See Mich. Comp. Laws § 37.2201(d); see also Dep't of Civil Rights ex rel. Peterson v. Brighton Area Schs., 171 Mich.App. 428, 437, 431 N.W.2d 65, 69 (1988) (reasoning that "because pregnancy is a condition unique to women, any distinction drawn on the basis of pregnancy denies women valuable rights solely on account of their sex").

■ The plaintiff has not produced direct evidence of pregnancy discrimination, but she has made out a prima facie circumstantial case. The McDonnell Douglas burden-shifting test is used in circumstantial pregnancy discrimination cases. Reeves v. Swift Trans. Co., Inc., 446 F.3d 637, 641 (6th Cir.2006). The plaintiff has presented affidavits or deposition testimony that Ms. LaBeff made comments about her pregnancy, such as, "With your weight and your age being pregnant, you're going to end up being off work all the time." Defs.' Mot. Summ. J. Ex. 1, Figgins Dep. at 77. The plaintiff testified that Ms. LaBeff often commented that the pregnancy would cause excessive absences. Pl.'s

Resp. Ex. 9, Figgins Dep. at 172. Ms. Starkey's affidavit indicates Ms. LaBeff complained that the plaintiff's pregnancy was inconvenient because it would require the plaintiff to be out of the office and stated, "What is she thinking about having a baby at her age?" Pl.'s Resp. Ex. 5, Starkey Aff. at ¶ 16. These remarks do not "require[ ] the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Amini*, 440 F.3d at 359. However, they support an inference of discrimination based on the plaintiff's pregnancy.

The plaintiff has shown that she was pregnant; she was qualified for her job at the time of her termination; and she was subjected to an adverse employment decision. *Prebilich–Holland*, 297 F.3d at 442. In addition, the comments by Ms. LaBeff constitute evidence of "a nexus between her pregnancy and the adverse employment decision." *Ibid.* The defendants' argument that this claim should be dismissed because the plaintiff had already given birth when she was terminated has no merit and is contradicted by *Kocak v. Community Health Partners of Ohio, Inc.*

The defendants also argue that LaBeff's comments were not complaints about the plaintiff's pregnancy but rather were focused on the associated cost. They claim that termination due to insurance costs does not constitute pregnancy discrimination, citing *Fleming v. Ayers & Assoc.*, 948 F.2d 993 (6th Cir.1991). However, the defendants' reference to *Fleming* misstates the holding of that case. In *Fleming*, the court held that the employer's "reluctance to employ Fleming was based upon the costs associated with providing expensive ongoing medical care for her child, which reluctance was unrelated to the fact that Fleming is a woman. Unlike pregnancy and its attendant medical conditions, dependent medical expenses are not gender-specific." *Fleming*, 948 F.2d at

997. However, "*Fleming* held that where plaintiff is terminated due to increased medical costs associated with plaintiff's newborn, Title VII protections do not apply because they do not encompass adverse employment actions based upon the medical condition of the child. Here, unlike in *Fleming*, Plaintiff alleges she was fired because of her pregnancy." *Russell v. Bronson Heating and Cooling*, 345 F.Supp.2d 761, 783–84 (E.D.Mich.2004). It is apparent from the record that LaBeff's comments related to the plaintiff's anticipated pregnancy-related absences, not dependent health care costs. *Fleming* does not support the defendants' argument.

The defendants claim to have terminated the plaintiff because there were no positions available at the time the plaintiff was able to return to work and because Ms. LaBeff was unhappy with the plaintiff's performance. These are legitimate, non-discriminatory reasons for termination. The plaintiff must therefore present evidence of pretext, which can be done "by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir.2003). In addition, "[a]n employer's changing rationale for making an adverse employment decision can be evidence of pretext. Shifting justifications over time calls the credibility of those justifications into question." *Cicero v. Borg–Warner*, 280 F.3d 579, 592 (6th Cir.2002) (internal cites and quote marks omitted).

The plaintiff has presented evidence that the first reason suggested by the defendants, that no positions were available, has no basis in fact. Ms. LaBeff testified at her deposition that the plaintiff had the opportunity to return to work at

the Lapeer store. "She was going back to Lapeer.... She would have stayed at the Lapeer store where she was employed until another position opened up that I could offer to a team member to create an opening." Pl.'s Resp. Ex. 2, LaBeff Dep. at 136. Ms. LaBeff claims the plaintiff was only terminated after she failed to report to work after being released by her doctor.

The plaintiff also has presented evidence that the second reason, that the plaintiff's performance was poor, has no basis in fact. The plaintiff has submitted a copy of a positive performance evaluation completed by Ms. LaBeff, which states that the plaintiff was a "[v]ery dependable employee" who "[p]roduces thorough, accurate and consistent work product." Pl.'s Resp. Br. at 2; see also Pl.'s Resp. Ex. 4, Performance Evaluation. In addition, the Termination Form completed by LaBeff makes no mention of the plaintiff's performance. It says, "Sue was on medical leave. Upon release from her doctor there was not an open position for her. Job eliminated." Pl.'s Resp. Ex. 17, Termination Form. Finally, the defendants' computer records indicate the plaintiff was terminated because her job was eliminated. These changing justifications for the plaintiff's termination provide sufficient evidence of pretext so as to preclude summary judgment.

### D.

Finally, the defendants argue that the plaintiff cannot establish either an interference or a retaliation claim under the Family and Medical Leave Act even if they mistakenly told her that she had no FMLA time left in August 2004. They note that the plaintiff originally requested eight weeks of leave beginning on August 9, 2004. The defendants claim the plaintiff at most only had seven weeks of FMLA leave available at that time, and her leave therefore expired on September 25, 2004. The plaintiff did not even attempt to return to work prior to this date, so the defendants believe she has no FMLA claim. However, the plaintiff points to evidence that Ms. LaBeff filled the plaintiff's position as branch manager as soon as she went on leave, with no plans to place her anywhere else. The plaintiff argues that this decision was made because the plaintiff took FMLA leave. In addition, the plaintiff states the defendants wrongfully denied her request for FMLA leave and misled her about how much leave she was entitled to take. She says that she could have requested and obtained medical clearance from her doctor before her leave expired if she had known the accurate information.

There is no dispute that the plaintiff actually furnished her medical clearance certificate after the expiration of her allotted twelve weeks according to the defendants' rolling calendar calculation method. "Once an employee exceeds [her] twelve weeks (or sixty workdays) of FMLA leave, additional leave in the twelve month period is not protected by the FMLA, and termination of the employee will not violated the FMLA." *Manns v. ArvinMeritor*, 291 F.Supp.2d 655–60 (N.D.Ohio 2003). The Sixth Circuit has held that in order "[t]o prevail in a claim of interference under the FMLA, the employee must prove, among other elements, that she was entitled to leave under the FMLA." *Hoffman v. Prof'l Med Team*, 394 F.3d 414, 418 (6th Cir.2005) (citing *Cavin v. Honda of Am. Mfg., Inc.*, 346 F.3d 713, 719 (6th Cir.2003)). This threshold is critical because an employee who cannot return to work within the 12–week period specified by the FMLA may not claim the protection provided by the Act. *See Cehrs v. Northeast Ohio Alzheimer's Research Ctr.*, 155 F.3d 775, 785 (6th Cir.1998). An employer is given flexibility under the Act to designate which twelve month period it

will use to calculate leave. 29 C.F.R. § 825.200(b). The employer may, as here, calculate this twelve month period by measuring backward from the date the employee takes any FMLA leave (i.e., a "rolling" leave year). *Ibid.*

The rule in *Cehrs*—that an employee "clearly unable to return to work within the period provided by the FMLA" cannot maintain an interference claim, 155 F.3d at 785—has been consistently applied by the court of appeals. *See Edgar v. JAC Products, Inc.,* 443 F.3d 501 (6th Cir.2006). However, *Cehrs* has been distinguished. In *Fisher v. Rizzo Bros. Painting Contractors, Inc.,* 403 F.Supp.2d 593 (E.D.Ky. 2005), a Kentucky district court refused to apply the *Cehrs* holding in a case where the plaintiff was not informed of how much FMLA leave she had available:

> Although the Sixth Circuit has held that an employee who is unable to return to work within twelve weeks has no remedy under the FMLA, *see Cehrs v. Northeast Ohio Alzheimer's Research Center,* 155 F.3d 775, 784–85 (6th Cir.1998), the Court concludes that it would be inappropriate to strictly apply that holding in this case for several reasons. First, Plaintiff has alleged that she was not advised of her FMLA rights, including the total amount of available leave. Second, it is unclear whether, had Plaintiff been advised of her FMLA rights, she *could have* returned to work after the twelve-week leave. Defendant argues that the fact that Plaintiff (per her physician's orders) *did not* return within the maximum allowable time is dispositive. The Court disagrees, especially where there is evidence that Plaintiff initially disregarded her physician's directive to stop working in October 2002.

*Fisher,* 403 F.Supp.2d at 600. In that case, the plaintiff had asked to take leave due to pregnancy. The defendant allegedly failed to inform her of her options under the FMLA or that her position upon return was guaranteed.

The *Edgar* court addressed this distinction as well:

> Edgar attempts to distinguish the *Cehrs* line of cases by limiting those precedents to situations in which no dispute exists as to whether the employee could resume her duties by the end of the FMLA-leave period. She relies instead on district court cases holding, unsurprisingly, that factual disputes regarding the employee's ability to return to work preclude summary judgment in favor of the employer. *See, e.g., (Mendoza v. Micro Electronics, Inc.,* No. 02 C 8005, 2005 WL 331585 (N.D.Ill. Feb. 8, 2005) (unpublished); *Shepherd v. Honda of Am. Mfg., Inc.,* 160 F.Supp.2d 860 (S.D.Ohio 2001); *Viereck v. City of Gloucester City,* 961 F.Supp. 703 (D.N.J. 1997)). As JAC persuasively demonstrates in its brief, however, both *Mendoza* and *Viereck* are factually distinguishable from the present case. In those two cases, the plaintiffs testified unequivocally that they would have returned to work by the end of the leave period if they had known that their jobs were at stake, and the employers could not demonstrate that the employees were medically unable to resume their positions. *See Mendoza,* 2005 WL 331585, at *5–*6; *Viereck,* 961 F.Supp. at 709.

> The plaintiff in the present case, in contrast, has not pointed to any competent proof that contradicts the testimony of Drs. Day and Kedzierski. Both of those doctors were of the opinion that Edgar could not return to work until well after the FMLA-leave period had expired in December of 2002. Edgar instead relies on a statement in her own deposition testimony where she claimed that she would have been able to timely

resume her duties. She acknowledged, however, that she was unaware of "what [her] doctors would have wrote down there to that respect." She also relies on an ambiguous answer given by Dr. Day, who said that she had no reason to doubt Edgar's statement that she "was prepared or preparing to return to work" when JAC terminated her. Dr. Day did not state, however, that Edgar could actually have returned to work. This testimony is therefore insufficient to establish that any mental health professional had released Edgar for work during the leave period, and does not contradict the consistent diagnoses of Drs. Day and Kedzierski.

*Edgar,* 443 F.3d at 510.

■ Ms. Figgins' case is more like *Mendoza, Viereck,* and *Fisher,* which the *Edgar* court found distinguishable from *Cehrs.* Ms. Figgins testified that she would have returned to work, and her doctor would have released her, before her available leave expired if she had been properly informed of her rights under the FMLA:

A. I could have come back to work in six weeks.

Q. Okay. Which would have been in October?

A. Yes.

. . .

Q. All right. And did you talk to your doctor about coming back in October?

A. If I would have went to my doctors and said there's a position available for me, can I go back to work, they would have let me go back to work at six weeks.

Q. Okay. So you could have come back in October?

A. There was no position available.

Defs.' Notice of Filing Deps [dkt # 17] Ex. 2, Figgins Dep. at 101–02. There is some additional evidence that bolsters that conclusion since the plaintiff actually gave birth on September 10, 2004, which was two weeks before her expected due date. The defendants have offered no evidence that the plaintiff was medically unable to resume her position at that time. There is no testimony from her physicians, apparently because their depositions were not taken. Had the defendants deposed the plaintiff's doctor, as the *Edgar* defendants appear to have done, perhaps they would have such evidence and be entitled to summary judgment. However, there is currently uncontradicted sworn testimony that the plaintiff would have returned to work prior to the expiration of her available leave had the defendants not misled her about her rights under the FMLA.

There also is a fact dispute as to how much FMLA leave the plaintiff was entitled to take when her full time leave began in August 2004. The plaintiff claims she only used 132.36 hours of FMLA leave in the year prior to August 9, 2004. This would mean she was entitled to 347.67 hours, or 8.69 weeks, of FMLA leave. She could have returned any time before October 7, 2004 without losing FMLA coverage. The defendants claim the plaintiff had only seven weeks of FMLA leave available at that time. This would mean the plaintiff's leave expired on September 25, 2004. Since the plaintiff did not return to work until November, the defendants argue she is not protected by the FMLA.

The plaintiff has submitted her time sheets from 2004 in support of her argument. The defendants have submitted calendars they claim support their argument. The Court finds that neither of these submissions is dispositive of the question. Certainly, the plaintiff's time records and the defendants' calendars do not match. For example, the plaintiff's records show that she worked eight hours on May 4, 2004. The defendants' records show zero hours for that day. Issues of fact abound.

Summary judgment on the FMLA interference claim is not appropriate.

■ In their reply brief, the defendants argue that the plaintiff did not plead a retaliation claim in her complaint. Count two of the plaintiff's complaint, the FMLA claim, contains the following statements:

36. Plaintiff went on leave from her position with Defendants on August 9, 2004.

37. Plaintiff was told a position was not available upon return from her leave, which was protected or guaranteed by the Family and Medical Leave Act, 29 U.S.C. § 2601 et seq.

38. In fact, a position was available.

39. Accordingly, Plaintiff hereby asserts a claim against Defendants for violation of the Family and Medical Leave Act, 29 U.S.C. § 2601 et. seq.

Compl. at 6. The complaint also states that "Supervisor LaBe[ff] said frequently that Plaintiff should be off work completely due to her pregnancy and her weight." Compl. at ¶ 25.

"The fundamental purpose of pleadings under the Federal Rules of Civil Procedure is to give adequate notice to the parties of each side's claims and to allow cases to be decided on the merits after an adequate development of the facts." *Lewis v. ACB Bus. Servs., Inc.*, 135 F.3d 389, 405 (6th Cir.1998) citing *Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir.1993). "[A] complaint . . . must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory." *Lewis v. ACB Bus. Servs., Inc.*, 135 F.3d 389, 406 (6th Cir.1998) (citing *Sogevalor v. Penn Cent. Corp.*, 771 F.Supp. 890, 893 (S.D.Ohio 1991)).

■ To establish her retaliation case, the plaintiff must offer some evidence that (1) she engaged in protected activity; (2)

her employer took adverse action; and (3) there is a causal connection between engaging in the protected activity and the adverse employment activity. *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 314 (6th Cir.2001). Although the pleading could have stated more clearly that the plaintiff was complaining about retaliation for requesting medical leave time, the Court believes that the pleading sufficiently put the defendants on notice that the plaintiff was asserting a retaliation claim.

■ There is a disputed fact on the question whether the plaintiff engaged in a protected activity, as discussed above. Viewing the evidence in her favor, however, the Court must conclude that she did. The plaintiff took leave, was adversely affected by an employment action, and the plaintiff has pointed to evidence suggesting a causal connection between the exercise of the protected right and the adverse employment action. The plaintiff testified that Ms. LaBeff made repeated negative comments that the plaintiff's pregnancy was going to cause her to take time off. The plaintiff states Ms. LaBeff stated, "With your weight and your age being pregnant, you're going to end up being off work all the time." Defs.' Mot. Summ. J. Ex. 1, Figgins Dep. at 77. The plaintiff stated Ms. LaBeff often commented that the pregnancy would cause excessive absences. In March or April 2004, LaBeff complained to Ms. Starkey that the plaintiff's latest pregnancy was inconvenient because it would require the plaintiff to be out of the office. The defendants claim the plaintiff was terminated because there were no open positions for her and because Ms. LaBeff was unhappy with her performance. However, as noted above, the plaintiff has presented evidence that these reasons are pretextual. Summary judg-

ment is precluded on the retaliation claim as well.

### III.

The Court finds that the plaintiff has not come forward with evidence to create a fact question on each of the elements of her age discrimination claim under state law. However, material fact questions preclude summary judgment for the defendants on the rest of the plaintiff's claims.

Accordingly, it is **ORDERED** that the defendants' motion for summary judgment [dkt # 16] is **GRANTED IN PART AND DENIED IN PART.**

It is **ORDERED** that the count six of the complaint alleging age discrimination under state law is **DISMISSED WITH PREJUDICE.**

It is **ORDERED** that the case shall proceed to trial on the remaining counts of the complaint.

It is further **ORDERED** that counsel for the parties shall appear for a Status Conference to be held at the United States District Court, 231 W. Lafayette Blvd, Chambers 802, Detroit, Michigan 48226 on **May 14, 2007 at 11:00 a.m.** to discuss the schedule for further proceedings in this case.